**Maurice LETNER and David Letner, Plaintiffs-in-Error,**

v.

**STATE of Tennessee, Defendant-in-Error.**

Court of Criminal Appeals of Tennessee.

Feb. 1, 1974.

Certiorari Denied by Supreme Court May 20, 1974.

Monte D. Curry, Asst. Public Defender, for Maurice Letner.

Dan Garfinkle, Nashville, for David Letner.

David M. Pack, Atty. Gen., William C. Koch, Jr., Asst. Atty. Gen., Michael D. Noel, Asst. Dist. Atty. Gen., Nashville, for defendant in error.

## OPINION

OLIVER, Judge.

Jointly indicted with Jerry W. Johnson and Arthur Campbell for the alleged first degree murder of Wilbur A. Thompson, after being granted a severance brothers Maurice Letner and David Letner were convicted of second degree murder. David was sentenced to imprisonment in the State Penitentiary for 10 years and Maurice for not less than 10 nor more than 20 years. They have brought their case to this Court for review by their appeal in the nature of a writ of error duly perfected.

David Letner's only Assignment of Error here and Maurice Letner's first two Assignments raise the usual challenge to the sufficiency of the evidence to warrant and sustain the verdict of the jury, Maurice insisting specifically that his conviction rests entirely upon the uncorroborated testimony of accomplices.

We summarize the material evidence. Alton Sykes testified that about 2:15 a. m. October 7, 1972, he and Rocky Willis came upon a Chevelle and a Rambler parked alongside each other; that to his left he saw the deceased, Wilbur Thompson, walking on the sidewalk; that three persons simultaneously emerged from the parked cars; that one of them slapped Thompson, who threw up his hands, and the other one shot him with a shotgun; that the men got back into the cars and drove away; that the defendants were the men who attacked the deceased, but he was uncertain as to which one did the shooting; that he heard no words exchanged; that he did not see a mustache on anyone; that he was too dumbfounded to observe the license number on the vehicles; that he was not certain as to the color of the men's clothing or their heights; that the area was well lighted; and that he later looked at pictures including those of the defendants.

Rocky Willis testified that as he and Sykes were riding, he saw the deceased walking down the street; that the driver of a Rambler automobile, which had stopped in front of them, got out, walked up to the deceased and slapped him; that he heard a shot; that looking around, he saw a man with a shotgun and a Chevelle beside the Rambler, but did not see it pull up; that the man with the gun got into the driver's seat of the Chevelle and the other man got back into the Rambler, and the two cars left; that he did not see the deceased with any weapons; that the deceased backed up as the men approached; that he did not remember anyone having a mustache; that he saw two persons in each car; that he did not recall how anyone was dressed, and he was sleepy at the time.

Co-defendant Arthur Campbell, who has been convicted of petit larceny, attempt to commit a felony, and felonious use of an automobile, testified that sometime after 1:30 a. m. David Letner drove him in his own Rambler to east Nashville; that they passed Jerry Johnson, Larry Tilson and Maurice Letner parked in a Chevelle, talking to Florence Dillard, and waved; that after turning onto Seventh Street, they saw the deceased on Letner's side of the car; that Letner yelled, "Get home, Nigger"; that the deceased, coming toward the car, said, "What did you say?"; that Letner repeated himself and got out of the car; that he also got out and stood beside the car; that Letner slapped the deceased, who made no advance toward Letner other than walking toward him; that after the deceased was struck, he saw what he thought was a knife in the deceased's hand; that the two men then began backing away from each other and he heard someone say, "Back off, Nigger" and the deceased turned; that he heard a shot and turning around saw Maurice Letner, who had pulled up, standing there with a shotgun; that they jumped into the car and subsequently went to his brother's house where Maurice Letner put the shotgun in a hall closet; that as he and David Letner got back into the car, David said, "Maurice killed that Nigger"; that the next day, David Letner showed him a knife, told him that he had tried to use it on the deceased,

but said, "Well, there ain't no blood on it, I didn't cut him"; that he, the Letners, Johnson and the defendants' girl friends subsequently fled the State and made up stories concerning the incident, such as that there was a group of Negroes instead of one, and Tilson got a gun and shot one of them; that after his return to Tennessee, he made a statement to the police and as a result, on Christmas night, David struck him in the head with a bottle and cut his face and tried to stab him in the chest and stomach and he was beaten by David's father and brother Gene.

Larry Tilson, who has been convicted of grand larceny, testified that he met Maurice Letner and Jerry Johnson at the Opportunity House, a half-way house for parolees; that about 1:05 a. m. they began riding around, stopping at a girl's house; that they next went to the Shelby area and stopped; that Maurice looked out the window and said, "My brother is in a fight and I'm going to help him"; that it appeared that the deceased, David Letner and Arthur Campbell were scuffling; that Maurice Letner jumped out of the car with a 410 gauge shotgun, pulled the trigger, jumped back into the car and said, "I think I got him"; that David Letner threatened to kill him if he told about the shooting and hit him either with his fist or a beer can, rendering him unconscious.

Thompson died of a shotgun wound in the chest. No weapons were found at the scene of the shooting.

Co-defendant Jerry Johnson, a defense witness, testified that as he and Maurice Letner passed the half-way house, Tilson, who was almost drunk, rode up in a cab and yelled at Maurice, inquiring if he knew where he could sell a gun; that Maurice replied that he did not know; that Tilson went up the steps to the house, came back with a shotgun and got into the back seat of the car; that after failing to sell the shotgun, they went to Florence Dillard's house; that they went to Seventh Street where they saw the deceased holding a knife and forcing David Letner to back up; that he and Maurice Letner got out of the car, and Maurice told the deceased to drop the knife; that the deceased began cursing Maurice and started toward him; that Tilson got out of the car and shot the deceased; that later that night Tilson and David Letner got into a fight after Tilson started bragging that he could not be whipped; that he, Campbell, the Letners and their girl friends fled the State; that as they were crossing the State line, Campbell hollered, "I killed a colored guy, come and get me Tennessee"; and that at the time of the shooting Maurice Letner was wearing a goatee.

Maurice Letner, who has previously been convicted of petit larceny, attempt to commit a felony and felonious use of an automobile, testifying as a witness in his own behalf said that he and Johnson were going down Eighth Street when they saw Tilson getting out of a cab; that Tilson, who was almost drunk, called to him and said he wanted to sell a shotgun; that after attempting to sell the gun, they went to Florence Dillard's house; that while there he saw Campbell's car go by, but did not realize his brother was in it; that he and Johnson then drove on to Seventh Street; that they saw Campbell's car parked on the street and his brother backing away from a man swinging a knife; that he and Johnson got out of the car and told the man to put the knife away; that the man began cursing and came at him with a knife; that Tilson got out of the car with the shotgun and shot the man; that everyone got back into the cars, and he followed Campbell to his brother's house where he gave the gun to Campbell, who put it somewhere; that he went back outside and saw his brother and Tilson down the street and Tilson's nose was bleeding; that he took Johnson and Tilson, who had passed out from drinking, home; that he learned later that his brother and Campbell got into a fight when Campbell came to his house and began cursing in front of his brothers and sisters and tried to make Gayla Redfern take him home; that he did

not tell the police his side of the story because he was afraid they would shoot him; that Campbell told him that he was the one who hollered at the deceased; that he could not recall if he wrote a letter to Florence Dillard, stating that he was going to testify and say that he did the shooting in order to get his brother off; and that at the time of the shooting, he had a mustache and a goatee.

Florence Dillard, Maurice Letner's former girl friend, testified for the defense that Johnson, Tilson, and Maurice drove up to her house; that a shotgun was in the car, between Tilson's legs; that 10 to 15 minutes later Campbell and David Letner passed and about five minutes later Maurice Letner left to catch up with his brother; that she subsequently fled the State with the defendants and that as they crossed the State line Campbell hollered, "I killed a black guy" and boasted that he was free; that at first Campbell said Tilson did the shooting, but changed his story after Maurice was arrested and said that Maurice did it; that after the shooting David Letner had a cut on his finger, and that Maurice Letner wrote her that he was going to take the witness stand and say that he shot the deceased so his brother could get off.

Gayla Redfern, David Letner's girl friend, testified as a defense witness that as she, Dillard, Campbell and the Letners crossed the State line, Campbell stated, "I killed a Nigger. Tennessee, come and get me"; that Campbell also said that Tilson did it, and later said that Maurice Letner did it; that around Christmas, Campbell and David got into a fight about a statement Campbell supposedly made about David insulting Maurices' girl friend; that while they were in California David's mother wrote to him and her, "I think you all will get out of it if you tell them that the guy had a knife on you or just deny it, one"; and that at the time of the shooting, Maurice had a beard. She identified that letter and it was introduced in evidence as an exhibit to her cross-examination.

David Letner did not testify.

The evidence further shows that the day following the shooting, Campbell, Johnson, the Letners, Redfern and Dillard fled to Detroit, and the next day returned to Nashville to pick up clothing. They then went to Indio, California and subsequently split up. Maurice Letner, Dillard and Johnson went to Sacramento, California where they were arrested in a stolen automobile after a high-speed chase. They contended that they borrowed the car from a man, not knowing it to be stolen. David Letner, Redfern and Campbell went to Phoenix, Arizona, where they were arrested.

We turn now to Maurice Letner's contention that he was convicted upon the uncorroborated testimony of accomplices. To make one an accomplice, there must be proof that he or she knowingly, voluntarily, and with common intent united with the principal offender in the commission of the crime. Hicks v. State, 126 Tenn. 359, 149 S.W. 1055; Monts v. State, 214 Tenn. 171, 191, 379 S.W.2d 34; Parham v. State, 78 Tenn. 498; Clapp v. State, 94 Tenn. 186, 30 S.W. 214; Moore v. State, 1 Tenn.Cr. App. 190, 432 S.W.2d 684; McAfee v. State, 3 Tenn.Cr.App. 424, 426, 463 S.W.2d 141.

Mere presence at the scene of the crime does not make one an accomplice, Hicks v. State, supra, nor does the mere fact that one was indicted for the same offense as the accused, Ripley v. State, 189 Tenn. 681, 227 S.W.2d 26. Whether one is an accomplice is a question for the jury under proper instructions, unless he so confesses. Hicks v. State, supra; Ripley v. State, supra.

Under the trial court's thorough instruction concerning the law of accomplices, this record leaves no room for reasonable doubt that the jury determined that Johnson and Campbell and Tilson were not accomplices. Certainly the jury could reach that conclusion because there is ample evidence to support that view.

In considering Assignments of Error challenging the sufficiency of the evidence in criminal cases, we must adhere to the time-honored principles enunciated so very many times by our Supreme Court and this Court. The jury's verdict of guilt, approved by the trial judge, strips the defendant of the presumption of innocence, with which the law clothed him throughout his trial, and he stands before this Court presumed to be guilty and he has the burden here of demonstrating that the evidence preponderates against the verdict and in favor of his innocence. The verdict so approved accredits the testimony of the prosecution witnesses and establishes the State's theory of the case. We may review the evidence only to determine whether it preponderates against the verdict, and in doing so we are required to take the verdict as having established the credibility of the State's witnesses. The verdict may not be overturned on the facts unless the evidence clearly preponderates against it and in favor of the innocence of the accused. Jamison v. State, 220 Tenn. 280, 416 S.W.2d 768; Webster v. State, 1 Tenn.Cr.App. 1, 425 S.W.2d 799; Hancock v. State, 1 Tenn.Cr.App. 116, 430 S.W.2d 892; Morelock v. State, 3 Tenn.Cr.App. 292, 460 S.W.2d 861; Chadwick v. State, 1 Tenn.Cr.App. 72, 429 S.W.2d 135; Phillips v. State, 2 Tenn.Cr.App. 609, 455 S.W.2d 637.

█ Considered in the light of those principles, unquestionably the evidence fully justified the jury in finding Maurice Letner guilty of second degree murder, and he has failed to carry his burden of demonstrating here that the evidence preponderates against the verdict and in favor of his innocence.

Upon this record, the jury could justifiably find, as they manifestly did, that David Letner initiated the whole trouble by shouting the quoted insults to the deceased who was a total stranger walking along the street minding his own business, stopped and got out and slapped him when the deceased started toward the car David and Campbell were in; and that about this time Maurice Letner drove up and got out with a shotgun and shot the deceased in the chest at point-blank range.

But the sufficiency of the evidence to sustain the conviction of the defendant David Letner is another matter. In Wharton on Homicide (3rd Ed.) § 50, the principles of law clearly applicable to him in the context of this case are stated as follows:

"To hold a person responsible for a homicide committed by another, as principal in the second degree, or otherwise, it must appear that he participated not only in the criminal act, but also in the criminal design of the person who did the deed causing death; or that, being aware of the malice or criminal intent entertained by the principal in the first degree, he aided, abetted, or encouraged him in the perpetration of the offense, such abetting and encouraging, with knowledge, being equivalent to legal malice or criminal intent on his part . . . It is a common design formed between two or more men which renders one of them criminally responsible for a homicide committed by the other, and not the independent resolutions of individuals acting alone and without agreement; it is the same design formed by both, and not by each for himself. And where two persons engage in a fight, and another, without the knowledge, consent, or connivance of either, inflicts a mortal wound upon one of them, the other is not criminally responsible, where there was no arrangement or conspiracy between him and the person doing the killing at or before the time of the difficulty to do any wrongful act to the deceased. And it is immaterial that the person sought to be held criminally responsible was the aggressor in the original combat."

There is no substantial evidence of any conspiracy or pre-conceived arrangement or design between David and Maurice Letner to set upon and assault and kill the deceased, a man who, insofar as this record

shows, neither of them knew or ever had seen before. There is only a scintilla of evidence to the contrary, consisting of the obviously confused recollection of Sykes that three persons, including the defendants, emerged simultaneously from the two parked cars, and that one of the defendants slapped the deceased and the other shot him with a shotgun, but he could not be certain which did which notwithstanding he said the area was well lighted. The scintilla rule is not recognized in Tennessee. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856.

Besides, that the jury did not accredit Sykes' story and did not find that the killing was pursuant to a common design by the two brothers to assault and kill the deceased is conclusively demonstrated by the fact that, instead of sentencing both defendants alike, they fixed David's maximum sentence at the statutory minimum of 10 years and sentenced Maurice to the maximum of 20 years. (T.C.A. § 39–2408).

■ Moreover, with further reference to Sykes, although as a general rule a conviction may rest upon the testimony of a single witness, though it be contradicted by others or appear uncertain or inconsistent, the rule does not apply if the testimony of such single witness is not of a cogent and conclusive nature, and "if it is so indefinite, contradictory or unreliable that it would be unsafe to rest a conviction thereon." 23 C.J.S. Criminal Law § 903.

Finally, the defendant Maurice Letner assigns as error that Juror Edwin Bate *"is believed to have sworn falsely* as to not knowing the facts of the case as well as the defendant and his family. See attached Affidavits 'A' and 'B' " (Emphasis supplied).

■ There is nothing in this record showing that any such occurred. Moreover, it is fundamental that a new trial motion is only a pleading and is not evidence or proof of the truth of matters

therein recited, and it affords no basis for relief where there is no evidence in the Bill of Exceptions to support the appellant's claim. Mitchell v. State, 3 Tenn.Cr. App. 494, 464 S.W.2d 307.

■ Further, the two affidavits which this defendant attached to his motion for a new trial are not included in the Bill of Exceptions, but instead he incorporates them, unauthenticated by the trial judge, in the technical record. The result is that we are precluded from considering the affidavits. Baldwin v. State, 204 Tenn. 639, 325 S.W.2d 244; Driscoll v. State, 191 Tenn. 186, 232 S.W.2d 28. A motion for a new trial does not take the place of a Bill of Exceptions. Baldwin v. State, supra.

But if we considered the affidavits, we could only conclude that the fact that the juror was acquainted with members of this defendant's family or that he may have received information concerning the case, absent a showing of bias or prejudice, would not disqualify him as a juror; and, *a fortiori,* the fact that the juror failed to volunteer those facts would not be a ground for a new trial absent any showing whatever that the defendant was prejudiced thereby. The vague statements contained in those affidavits are totally insufficient to show that this juror was disqualified.

But beyond that, the transcript of the voir dire examination of the jurors shows that the trial judge carefully qualified all prospective jurors generally, and that counsel examined and excused several peremptorily, and that the juror in question was accepted without any questions by the State or defense counsel.

■ All prospective jurors are presumed to be qualified when they are presented, and, when, as in this case, the record shows that jurors were duly elected, empaneled, tried, and sworn, it is presumed that they were fair and impartial jurors, since the trial judge has the exclusive right to pass on their selection. Kirkendoll v. State, 198 Tenn. 497, 281 S.W.2d 243;

Long v. State, 187 Tenn. 139, 213 S.W.2d 37. To overthrow this presumption of competency, a clear case must be made out against it. Kirkendoll v. State, supra.

The judgment of the trial court is affirmed as to Maurice Letner and reversed and remanded for a new trial as to David Letner.

WALKER, P. J., and O'BRIEN, J., concur.