IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 5, 2002

## STATE OF TENNESSEE v. JEFFERY CONNOR

**Appeal from the Criminal Court for Shelby County**
**No. 00-09169     James C. Beasley, Jr., Judge**

———————

**No. W2001-02604-CCA-R3-CD - Filed January 8, 2003**

———————

A Shelby County Criminal Court jury convicted the defendant, Jeffery Connor, of aggravated rape, a Class A felony, and the trial court sentenced him as a Range I, violent offender to twenty-four years in confinement. The defendant appeals, claiming that the evidence is insufficient to support his conviction and that the trial court improperly enhanced his sentence. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ., joined.

AC Wharton, Jr., District Public Defender; Garland Erguden, Assistant District Public Defender; and Charles D. Wright, Assistant District Public Defender (at trial), for the appellant, Jeffery Connor.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; William L. Gibbons, District Attorney General; and Kevin R. Rardin and Michael S. Davis, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the defendant and his two codefendants raping the victim. The victim testified that in 1999, she was living on Haynes Street in Memphis with her four children and her boyfriend, Golden Cage. On the night of December 29, the victim and Mr. Cage had an argument, and he left their home. About 2:30 a.m. on December 30, the victim decided to call Mr. Cage on his cellular telephone and find out where he had gone. Because her home did not have a telephone, the victim needed to walk to a Mapco convenience store to use a pay telephone. As the victim was walking on Park Street to the store, she approached Joseph Jones's house and saw Mr. Jones, Durrell Tate, and the defendant standing in Mr. Jones's front yard. The victim knew Mr. Jones because he had dated Vanessa Stennis, the victim's friend, but she had never seen Mr. Tate or the defendant before. As the victim walked by the three men, the defendant approached her and asked if she had

seen a man riding a bicycle down the street. The victim told him no and turned to walk away. The defendant grabbed the victim, threw a coat over her head, and said, "Bitch, don't you say nothing." Mr. Tate also grabbed the victim and threatened to kill her if she said anything. The victim testified that the defendant and Mr. Tate were wearing jackets with hoods and that the hoods were pulled over their heads.

The defendant and Mr. Tate hit the victim and pushed her into a building that was attached to the back of Mr. Jones's house. The two men took the coat off the victim's head, and the victim stood in a corner. The victim asked the defendant and Mr. Tate to let her go, but Mr. Tate hit the victim in the head with his fists and told her to shut up. The defendant told the victim to take off her pants, that he wanted to look at her body, and that they were "going to have a long night."

The victim took off her pants, and the defendant told her to stand in front of him and put her head between his legs. The victim, who was four feet eleven inches tall and weighed one hundred twenty-five pounds, did as the defendant instructed. The defendant told Mr. Tate to help him lift the victim. The defendant lifted the victim's torso and slammed her headfirst onto a table. After hitting the table, the victim hollered, jumped up, and ran into a wall. She acknowledged that after the defendant dropped her, she was in pain. The defendant told the victim to take off her shirt, and when she refused, the defendant wrestled with the victim and told Mr. Tate to hit her. The victim asked the men not to hit her and agreed to take off her clothes. The defendant told her to bend over a table and while the victim was bent over, the defendant raped the victim vaginally. Mr. Tate and Mr. Jones, who had come into the room, also raped her vaginally. The victim stated that all three of the men used condoms and that as each man was raping her, the other two watched and laughed. She said that Mr. Tate and Mr. Jones did whatever the defendant said.

After the rapes, the men made the victim sit in a corner while they smoked marijuana. The victim asked the men to let her go, but they refused. The victim asked the men why they had done this to her, and the defendant and Mr. Tate told her that they were "bringing in the new millennium." When the sun came up, the defendant told Mr. Tate and Mr. Jones to cover the windows of the room. The defendant also instructed Mr. Tate to stand over the victim and kill her if she looked up. Mr. Tate said they needed to kill the victim because she knew Mr. Jones. The victim begged the men not to kill her and told them that she had children at home. The defendant told the victim that because she had cooperated with them, she could leave the room at 6:30 a.m. However, he threatened to kill her and her children if she told anyone about the rapes. As the defendant was standing in the doorway of the building, the sunlight was shining on him and the victim could see his face. Eventually, all three of the men left the building, and the victim ran home. She said that she did not leave the building until about 8:00 a.m. and that she had been in the building about five hours.

The victim testified that she took a shower, dressed, and went to Vanessa Stennis's house. The victim told Ms. Stennis that Mr. Jones and his friends had raped her, and the victim asked Ms. Stennis to go with her to Mr. Jones's house. Ms. Stennis told the victim to call the police, but the

victim refused and said she wanted to take care of the situation herself. Ms. Stennis and the victim went to Mr. Jones's house. Mr. Jones was not there, and the victim went home.

About 12:00 p.m., Mr. Cage returned home and found the victim crying. The victim told him that she had been beaten and raped, and Mr. Cage wanted her to call the police. The victim refused, and the next day, December 31, Mr. Cage called the police and reported the rapes. When the police came to the victim's home, she took them to the building behind Mr. Jones's house. At first, the police told the victim that they could not do anything about the rapes because she had waited more than thirty hours to report them. At some point, though, they arrested Joseph Jones, and the victim identified him as one of her attackers. On January 31, 2000, the victim met with Sergeant M. A. Worthy and viewed a photograph array. The victim picked out the defendant's photograph and identified him as the man who had dropped her headfirst onto the table. She said she was positive that the defendant was one of the men who raped her on December 30. The victim acknowledged having two prior convictions for theft of property valued less than five hundred dollars.

On cross-examination, the victim testified that she had not been drinking on the night of the rapes. She said that although she had turned away from the defendant and Mr. Tate when they grabbed her on Park Street, she could tell that the defendant was the man who threw the coat over her head. The victim acknowledged that she did not scream or struggle when the defendant and Mr. Tate took her into the building. She said that although it was dark in the building, lit candles were in the room. She acknowledged that she did not go to a doctor or get any treatment for her injuries. The victim also acknowledged that on January 4, 2000, she gave a statement to the police and that in the statement, she did not say that the defendant talked to her on Park Street before he grabbed her. She denied telling the police that Mr. Cage did not come home until 2:00 a.m. on December 31.

Vanessa Stennis testified that she used to date Joseph Jones and that she lived down the street from the victim. About 9:00 a.m. on December 30, 1999, Ms. Stennis was watching television when the victim came to her house. The victim was crying and told Ms. Stennis that Joseph Jones and two of his friends had raped her. The victim was angry and upset and wanted to kill the three men. Ms. Stennis got a knife and went with the victim to the victim's house. The victim got a gun from her home, and she and Ms. Stennis went to Mr. Jones's house. Mr. Jones was not there, and the victim went home. The next day, the victim and Ms. Stennis returned to Mr. Jones's house, and Mr. Jones answered the door. While Ms. Stennis was talking to Mr. Jones, the victim stabbed Mr. Jones near his mouth. Ms. Stennis acknowledged having prior convictions for theft of property and forgery. On cross-examination, she testified that the victim was afraid to go to the rape crisis center. Ms. Stennis never talked to the police, and the police never questioned her about the victim's stabbing Mr. Jones.

Golden Cage testified that in December 1999, he and the victim lived together on Haynes Street. On the night of the crimes, he and the victim had a disagreement, and he left their home. When he returned home about 10:00 a.m. the next day, the victim was crying and hysterical. The victim told Mr. Cage that she had been beaten and that Joseph Jones and his friends had raped her. The victim was hurt, and Mr. Cage noticed that she had large knots on her head. Mr. Cage asked

the victim to call the police, but she refused because the men had threatened to kill her and her children. Mr. Cage said that he called the police on December 30 and that the police came to their home twice, once to interview the victim and once to take her to the crime scene. On cross-examination, Mr. Cage testified that he had no knowledge of the victim having a gun or searching for the three men. He said that after he argued with the victim on the night of the rapes, he was gone from their house for hours, not days.

Officer Donald Crowe of the Memphis Police Department testified that he was dispatched to the victim's home about 6:00 a.m. on December 31, 1999. When he arrived, the victim told him that she had been raped the day before. Officer Crowe gathered information from the victim and took her to the crime scene, which was about one and one-half blocks from the victim's home. The victim led Officer Crowe to a rear shed that was attached to the house. Inside, he found beer bottles, potato chip bags, and about fifty used condoms. The victim told Officer Crowe and his partner that one of her attackers lived in the home. The officers knocked on the front door, but no one answered. On cross-examination, Officer Crowe testified that he did not take any pictures of the crime scene or gather any evidence. The defendant presented no proof, and the jury found him guilty of aggravated rape.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant claims that the evidence is insufficient to support his conviction. He claims that no physical proof linked him to the crime and that the only evidence against him was the victim's testimony. The state contends that the evidence is sufficient. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Moreover, a defendant may be convicted upon the uncorroborated testimony of one witness. See Letner v. State, 512 S.W.2d 643, 649 (Tenn. Crim. App. 1974); see also Shelley v. State, 95 Tenn. 152, 155-56, 31 S.W. 492, 493 (1895) (noting that a victim of incest by force is not an accomplice and that a conviction may rest upon such victim's uncorroborated testimony); State v. McKnight, 900 S.W.2d 36, 48 (Tenn. Crim. App. 1994) (holding that a "defendant can be convicted of simple rape based solely upon testimony of the victim").

As charged in the indictment, aggravated rape occurs when a defendant, while being aided and abetted by at least one other person, unlawfully sexually penetrates the victim and uses force to accomplish the act. Tenn. Code Ann. § 39-13-502(a)(3)(A). Viewed in the light most favorable to the state, the victim's testimony sufficiently sustains the defendant's conviction for that offense. The

victim testified that the defendant grabbed her and that he and Mr. Tate pushed her into a building. Inside, the defendant and Mr. Tate repeatedly hit the victim, and the defendant made her take off her clothes. After the defendant dropped the victim headfirst onto the table, he ordered her to bend over, and he penetrated her vagina with his penis. The victim testified that Mr. Tate and Mr. Jones also raped her. Eventually, the codefendants left the building and the victim was able to escape. Vanessa Stennis and Golden Cage testified that they saw the victim crying and that the victim told them Mr. Jones and his friends had raped her. The victim stated that her attackers used condoms, and Officer Crowe testified that he saw used condoms in the building where the victim said the rapes occurred. The weight and value to be given to the evidence are resolved by the trier of fact, not this court. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). We conclude that a rational jury could have found beyond a reasonable doubt that the defendant, with the help of his codefendants, forcefully raped the victim. The evidence is sufficient to support his conviction.

## II. SENTENCING

The defendant contends that his sentence is excessive because the trial court improperly gave great weight to enhancement factor (2), that he was a leader in the commission of the offense. See Tenn. Code Ann. § 40-35-114(2). In addition, he contends that the trial court erroneously applied enhancement factor (5), that he allowed the victim to be treated with exceptional cruelty, and factor (7), that he committed the offense to gratify his desire for pleasure or excitement, to his sentence. See Tenn. Code Ann. § 40-35-114(5), (7). The state contends that the trial court properly sentenced the defendant. We agree with the state.

At the sentencing hearing, the state and the defendant relied on the defendant's presentence report. According to the report, the then twenty-one-year-old defendant was married with no children. The report shows he did not graduate from high school and did not obtain a GED. The defendant stated that he was in excellent physical and mental health and that he did not use alcohol or illegal drugs. Although the defendant claimed to have worked some, the report reflects that the defendant had been unemployed since 1996. It also shows that he has a prior conviction for misdemeanor assault and has a juvenile history of difficulties with the law.

In sentencing the defendant, the trial court noted that as a Range I offender, the defendant's presumptive sentence for his conviction was twenty years, the midpoint in the range for a Class A felony. See Tenn. Code Ann. § 40-35-112(a)(1). The trial court found the following enhancement factors applicable pursuant to Tenn. Code Ann. § 40-35-114: (1) the defendant has a previous history of criminal convictions or behavior beyond that necessary to establish his range; (2) the defendant was a leader in the commission of the offense and the offense involved two (2) or more criminal actors; (5) the defendant allowed the victim to be treated with exceptional cruelty; (7) the offense involved a victim, and the defendant committed it in order to gratify his desire for pleasure or excitement; and (8) the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving his release into the community. The trial court did not find any applicable mitigating factors and gave great weight to enhancement factors (2), (5), and (7). The trial court gave no weight to factor (8) and sentenced the defendant to twenty-four years.

Appellate review of sentencing is <u>de novo</u> on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. <u>State v. Fletcher</u>, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." <u>State v. Ashby</u>, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

<u>State v. Jones</u>, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a <u>de novo</u> review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; <u>see</u> <u>Ashby</u>, 823 S.W.2d at 168; <u>State v. Moss</u>, 727 S.W.2d 229, 236-37 (Tenn. 1986).

The sentence to be imposed by the trial court is presumptively the midpoint in the range for a Class A felony unless there are enhancement factors present. Tenn. Code Ann. § 40-35-210(c). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors. Tenn. Code Ann. § 40-35-210(d)-(e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments; <u>Moss</u>, 727 S.W.2d at 237; <u>see</u> <u>Ashby</u>, 823 S.W.2d at 169.

Although the defendant does not contest the trial court's application of enhancement factor (2) regarding his being a leader, he claims that the trial court erred in giving it great weight. However, as stated above, as long as the trial court followed the sentencing purposes and principles, the weight to be afforded an existing factor is left to the trial court's discretion. In this case, the

defendant approached the victim and threw a coat over her head. After he and Mr. Tate took the victim into the building, the defendant ordered the victim to take off her clothes. The evidence shows that the defendant was the first man to rape the victim and that after the rapes, he told Mr. Tate to stand over the victim and hit her if she looked up. The victim testified that the defendant gave orders to Mr. Tate and Mr. Jones and that the two men did whatever the defendant said. We hold that the trial court's findings with respect to factor (2) are adequately supported by the record.

Next, the defendant claims that the evidence fails to support the trial court's application of enhancement factor (5), that he treated the victim with exceptional cruelty during the commission of the offense. The application of factor (5) requires "exceptional cruelty," which is usually found in cases of abuse or torture. See State v. Williams, 920 S.W.2d 247, 250 (Tenn. Crim. App. 1995). Our supreme court has held that the facts must support a finding of "'exceptional cruelty' that 'demonstrates a culpability distinct from and appreciably greater than that incident to'" the crime. State v. Poole, 945 S.W.2d 93, 98 (Tenn. 1997) (quoting Jones, 883 S.W.2d at 601). In other words, proper application of this factor requires a finding of cruelty "over and above" that required for the offense itself. State v. Arnett, 49 S.W.3d 250, 258 (Tenn. 2001).

The trial court held that the defendant's forcing the victim to place her head between his legs and then using a "wrestling move" to drop her headfirst onto a table warranted application of enhancement factor (5). We agree. Although the defendant claims that the trial court improperly applied enhancement factor (5) because the state presented no evidence that the victim suffered any serious or permanent injury as a result of his dropping the victim, the evidence shows that after the defendant dropped the victim, the victim hollered, jumped up, and ran into a wall. The victim acknowledged that she was in pain after the defendant dropped her, and Golden Cage testified that he saw large knots on the victim's head. We conclude that the defendant's lifting the victim upside down and dropping her headfirst onto a table goes over and above what was required for aggravated rape as charged in the indictment and supports the trial court's application of this enhancement factor.

Finally, the defendant claims that the trial court improperly applied enhancement factor (7), that the defendant raped the victim to gratify his desire for pleasure or excitement. In this case, the trial court ruled that factor (7) applied because the defendant stated after the crimes that he raped the victim in order to bring in the new millennium.

Initially, we note that factor (7) is not an essential element of aggravated rape and may be considered as an appropriate enhancement factor. State v. Adams, 864 S.W.2d 31, 34-35 (Tenn. 1993). That said, we agree with the trial court that the defendant's statement about bringing in the new millennium supports the trial court's applying this enhancement factor. In addition, we believe the defendant's statement to the victim that he wanted to look at her body also serves as additional evidence that he raped the victim to gratify his desire for pleasure or excitement. We conclude that the evidence does not preponderate against the trial court's applying enhancement factor (7), and we hold that the defendant has failed to demonstrate that his sentence is excessive.

Based on the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, JUDGE