IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 16, 2014

**STATE OF TENNESSEE v. RICHARD THOMAS KELLEY**

**Appeal from the Circuit Court for Montgomery County**
**No. 41201018    John H. Gasaway, III, Judge**

_____

**No. M2014-00740-CCA-R3-CD - Filed April 16, 2015**

_____

The defendant, Richard Thomas Kelley, was convicted after a jury trial of four counts of rape of a child, a Class A felony; three counts of aggravated sexual battery, a Class B felony; and one count of assault, a Class B misdemeanor. He was sentenced to thirty years' imprisonment for each of the convictions for rape of a child, ten years' imprisonment for each of the convictions for aggravated sexual battery, and six months' imprisonment for the assault conviction, all to be served concurrently at 100%. On appeal, the defendant challenges the sufficiency of the convicting evidence. After a thorough review of the record, we conclude that the evidence is sufficient to support the verdicts, and we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

Gregory D. Smith, Clarksville, Tennessee, for the appellant, Richard Thomas Kelley.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; John W. Carney, District Attorney General; and Kimberly Lund, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

The defendant was charged with eight counts of rape of a child and five counts of aggravated sexual battery for acts committed against his granddaughter, who was twelve years old at the time of the offenses. Prior to trial, the State dismissed the first count of the indictment charging aggravated sexual battery, and the trial court renumbered the remaining counts for the consideration of the jury. At trial, the State presented the testimony of the victim and the victim's mother during its case-in-chief.

The victim's mother testified she and her family moved back into her childhood home around 2009 because her mother had cancer and her father, the defendant, needed help providing the necessary around-the-clock care. The victim's mother testified that both she and the victim's grandparents contributed financially to the household, splitting the rent and utilities. The house had three bedrooms: one was occupied by the defendant and the victim's grandmother, one was occupied by the victim's mother and stepfather, and one was occupied by the victim and her younger sister.

The victim's mother testified that the victim was born on October 25, 1999, and she was around nine years old when they moved into the house. The victim had a good relationship with her grandmother, who helped take care of the children after her convalescence. The victim had a limited relationship with the defendant because she had not spent much time with him.

When the victim's family moved in with her grandparents, the defendant worked at a heating and cooling company, but eventually he started his own tire business, which he first operated out of his home and later out of a shop in a building he rented. The defendant had three employees in the shop. The victim's mother testified that the shop was a one-car bay and that there was a room to the side which was used as storage and where a radio was kept. The shop was in the back of the building and would not have been visible from the road. There was also limited visibility looking into the shop because it was dark and used as storage. The inside of the shop was "like a maze" to navigate through, and employees would sometimes go behind the counter to sleep. The victim's mother acknowledged that the bay door was generally open, and she believed there was no air conditioning.

In 2012, the victim would occasionally go to the defendant's shop with her grandmother. In May or June, the victim's mother noticed that the victim was speaking with the defendant more and spending more time with him. The victim also went on "road calls" with him after the defendant told the victim that her mother used to go on "road calls" when she was young.

On June 8, 2012, the family went on a camping trip to celebrate the birthday of the victim's grandmother. The victim was sharing a tent with her sister and initially did not want to come out of the tent. After her mother spoke to her, she came and sat immediately beside the defendant. The victim's mother was looking at her phone but glanced up to see the defendant put his arm around the victim's shoulder. A few minutes later, she observed him rubbing his arm "all up and down her leg." The victim's mother asked the victim to go back into the tent. She later spoke to the victim about what she had observed and contacted the police as a result of the conversation. The victim last had contact with the defendant on June 10, 2012. The victim's mother testified that the victim's behavior had changed since the abuse and that she was getting into trouble at school and seemed angry.

The victim's mother acknowledged that she had experienced problems with boyfriends in the past. She recalled taking out an order of protection against the victim's father, William Wright, in 2002 because she alleged that the victim's father had choked her while the victim was present. She testified that she had requested to have the order of protection dismissed. The victim's mother also acknowledged lodging a complaint with the Department of Children's Services ("DCS") in 2007 that the victim's father was watching pornography with the victim and giving her alcohol. She denied that this complaint was dismissed and testified custody was taken from the father. She did not recall telling DCS that the victim's father had attacked her with a knife while she was holding the victim and denied that the judge determined she was not a credible witness.

The victim's mother agreed that there was an incident at the victim's daycare in which the victim and a little boy had placed their hands down each other's pants. She testified that she later learned the little boy was being abused and that she removed the victim from the daycare. She was not aware if the boy was forced to leave. The victim's mother acknowledged that the victim's grandmother once complained to DCS about the victim's mother, but she testified that the complaint was made because the victim's grandmother was "mentally not stable." She did not recall posting a picture of herself and the defendant with the words, "beautiful people" in March 2013 on social media, although she acknowledged having posted some family photos and stated that she did not deny posting the photo. The victim's mother acknowledged that her husband did not get along with her parents.

The victim testified that she was fourteen years old at the time of trial. She confirmed her mother's testimony that her family lived with her maternal grandparents and that the defendant owned a tire shop. The victim drew a diagram of the tire shop, which showed a single bay for vehicles and a separate storage area. The victim testified that the first incident of abuse that she could remember with the defendant was in 2012, when she was twelve years old and school was almost out. She and the defendant were cleaning the pool when he began to stare at her breasts and tell her that boys would want to touch her now that she was

getting older. The defendant then said, "[I]f I show you mine will you show me yours[?]" They went into the house, he asked her to come to his room, and he tried to pull her close and kiss her.

The victim then testified to several incidents that took place at the tire shop. She testified that her grandfather forced her to perform fellatio behind a van in the shop. One of his employees was at the shop that day but did not see what happened. A second time, they were both sitting on a couch at the shop, and the defendant touched her breasts and kissed her. The prosecutor asked whether the touching occurred on her skin or over her clothing, and the victim responded, "He went under my shirt. So my skin." The prosecutor then asked her if she was wearing a bra and if the defendant touched under her bra, and the victim stated, "On top of my bra."

In a third incident , the defendant took her to the storage area, pulled down her shorts and underwear, and put his finger inside her "part." The victim also testified that there was a bench outside the shop and that one time, as she sat on this bench, the defendant came up and began to rub her groin over the clothing.

The victim testified that she went on two road calls with the defendant. During one of the road calls, the defendant was fixing the tire of a tractor, which was located in the middle of a field. He touched her breasts while he was seated on the tractor. Then he forced her to perform fellatio while he sat on a tractor tire with his hands beside him. The victim testified that he also forced her to perform fellatio once in a corner of their home garage where tools were kept next to some outlets.

The victim also testified regarding several incidents that occurred in her home. She testified that the defendant once told her sister to go outside and that he kissed her in the home on the couch after her sister left. She also testified that she once went into the kitchen when the defendant was there and that he pulled her over and touched her breast over her bra. On a separate occasion, "Benny" was watching football, and the victim  went to watch American Idol with the defendant in his room. The defendant was rubbing her leg "and then kind of slowly went up to my private area and . . . was rubbing around there." Her sister entered the room, and he stopped. The victim testified that she did not have a relationship with the defendant prior to the abuse. After the defendant began to abuse her, he bought her and her sister bicycles, and he bought her headphones. When her mother asked her if anyone was touching her, she said no at first because the defendant had told her that both she and he would go to jail and she believed him.

On cross-examination, the victim testified that she recalled the incident with the boy at her daycare and that she recalled the incident with her father showing her pornography.

4

She did not recall going to counseling in relation to anything other than the defendant's crimes. She agreed that her school records showed disciplinary action for hitting a student and for making an obscene gesture on the bus in 2010. She also acknowledged several disciplinary actions which occurred after the defendant began to abuse her and about which the defense questioned her thoroughly.

The defense attempted to impeach the victim with her testimony at the preliminary hearing in July 2012. The victim acknowledged that at the preliminary hearing, she had described the digital penetration as occurring in a "hallway." At trial, she explained that when she said "hallway," she was referring to a cleared pathway through the cluttered storage room, which while "not really a hallway, . . . was kinda like made as a hallway." She clarified that the room was crowded with things like tires and sheetrock and concluded, "It's a storage room and then there's like a little path but, no, there's no actual hallway." She acknowledged that the transcript of the preliminary hearing reflected that she did not identify other places in the shop where abuse had occurred. She also acknowledged having said that the pool incident occurred after school let out and not before. She testified that she was at the shop only three or four times. She agreed that at the preliminary hearing, she had testified that the defendant's hands were on her head while he was sitting on the tire but at trial she had said they were at his side. On redirect examination, she explained that she did not recall exactly where the defendant's hands were on that day but she recalled the rape itself. She elaborated that the space she was referring to as a "hallway" at the hearing was actually a narrow path in a room crowded with supplies. She explained, "It's just a big long space that was empty and we could walk through it, and then there was stuff piled up against the walls, so that's why I call it a hallway."

At the close of the State's proof, the defendant moved for a judgment of acquittal. The parties agreed that there was not sufficient proof to continue with all the counts in the indictment. The trial court dismissed four counts charging rape of a child, and the State elected which offenses to assign to the remaining four counts of rape of a child and four counts of aggravated sexual battery.

The defendant presented several character witnesses on his behalf. Mary Nulty had known the defendant and his wife for a number of years because the defendant and his wife went daily to the diner where she worked, and she considered him a friend. Sarah Nulty saw the defendant and victim together once and did not notice anything out of the ordinary. Bruce Parker had been a customer of the defendant's for twenty years, and he was at the defendant's shop two or three times a week in the summer of 2012. He rarely saw the victim there, and he testified the defendant had an employee who was almost always at the shop. Anthony Kelley, the defendant's brother and neighbor, testified he did not see the defendant and victim together often and that the victim's sister was usually with them. He testified that

5

he was not home frequently and only saw the defendant around the house once or twice a month.

Mary Fellows testified that the defendant is her cousin and that she was managing the property on which his shop was located. She testified that she kept carpets, sheetrock, cabinets, doors, and other supplies in the storage room but that the defendant did not store anything, particularly tires, there. Ms. Fellows was at the shop once or twice a day during the summer of 2012, and she only saw the victim once, with her stepfather. Although Ms. Fellows attempted to discredit the victim's testimony by testifying that the storage area was open with no hallways or doors, on cross-examination, she acknowledged that to get around the storeroom, "I just made a walkway . . ."

The defendant also recalled the victim's mother as a witness. Although the victim had testified she did not recall receiving counseling prior to the defendant's abuse, the victim's mother testified the victim, who was born in 1999, did receive counseling in 2002. The victim's mother acknowledged that the victim had hit another child and made an obscene gesture but testified that both of these incidents were in response to actions from another child. She acknowledged the disciplinary incidents which occurred after the abuse.

The defendant testified on his own behalf that he did not touch the victim's breasts or groin area and did not rape her or force her to perform fellatio. He testified that he did not know why the victim would say that he did these things. On cross-examination, he acknowledged that she had visited his shop and garage but stated she was always with her grandmother or stepfather. He testified he did give her headphones but that the bicycles were presents from an employee. The defendant acknowledged that she was a "good kid." The defendant denied ever having been alone with the children and testified that the victim had never gone on a "road call" with him.

In rebuttal, the State presented the testimony of Benjamin King. Mr. King had known the defendant since Mr. King was five years old, and he worked at the tire shop for a period and also stayed in the home with the victim, defendant, and their family from December 2011 until the following summer. He stated that he saw the victim and defendant together at the shop and that he saw them leave for a "road call" together. Mr. King testified that the victim was at the shop a couple of times a week and that she was always with an adult. The garage area had access to the storage area, which had three stacks of drywall so that "[i]t could be considered a hallway." On cross-examination, he acknowledged that he had not paid rent when he stayed with the family and that he was currently working as a cook in the victim's mother's store. He testified that he had found it difficult to keep a job and that his job as a cook was one of the longest term jobs he had held. The victim's mother was a district manager and not his immediate supervisor.

6

The jury found the defendant guilty of four counts of rape of a child, three counts of aggravated sexual battery, and one count of assault, a lesser-included offense of aggravated sexual battery. The defendant was convicted in Count 1 of rape of a child based on the testimony of fellatio by the van; the defendant was convicted in Count 2 of aggravated sexual battery based on the testimony that he touched the victim's breasts on the couch at the shop; the defendant was convicted in Count 3 of rape of a child based on the testimony of digital penetration in the storeroom; the defendant was convicted in Count 4 of aggravated sexual battery based on the testimony that he touched the victim's groin on the bench outside the shop; the defendant was convicted in Count 5 of rape of a child based on the testimony of fellatio by the tractor during the "road call"; the defendant was convicted in Count 6 of aggravated sexual battery based on the testimony that he touched the victim's groin in his bedroom while watching TV; the defendant was convicted in Count 8 of assault based on the testimony that he touched the victim's breasts and kissed her in the kitchen; the defendant was convicted in Count 10 of rape of a child based on the testimony of fellatio in the home garage. On appeal, the defendant challenges the sufficiency of the evidence.

## ANALYSIS

The defendant contends that the evidence was insufficient to support the verdicts. This court must set aside a finding of guilt if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). The question before the appellate court is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). This court will not reweigh or reevaluate the evidence, and it may not substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). The jury's guilty verdict, approved by the trial judge, accredits the State's witnesses and resolves all conflicts in favor of the prosecution. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that can be drawn from it. *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). "Because the verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, Defendant bears the burden on appeal of showing why the evidence is insufficient to support the jury's verdict." *State v. Franklin*, 308 S.W.3d 799, 825 (Tenn. 2010).

Rape of a child is "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen

(13) years of age." T.C.A. § 39-13-522(a) (2010). Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." T.C.A. § 39-13-501(7). Aggravated sexual battery is "unlawful sexual contact with a victim by the defendant or the defendant by a victim" when, as charged here, the victim is under thirteen years old. T.C.A. § 39-13-504(a)(4). Sexual contact includes "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6). "Intimate parts" includes "semen, vaginal fluid, the primary genital area, groin, inner thigh, buttock or breast of a human being." T.C.A. § 39-13-501(2).

In support of his sufficiency challenge, the defendant contends that the victim made contradictory statements which essentially cancel each other out, leaving no evidence to support the verdict, and that certain alleged inconsistencies in the victim's testimony require the court to disregard her testimony entirely. In *State v. Matthews*, this court observed that "contradictory statements by a witness in connection with the same fact cancel each other." *State v. Matthews*, 888 S.W.2d 446, 449 (Tenn. Crim. App. 1993). The court noted that, unlike a situation in which the jury is given contradictory facts from two witnesses and is then called on to make a credibility determination, a witness's self-contradictory testimony weighs equally in favor of either version and cannot be resolved except through caprice. *Id.* at 449-50 (citing *Johnston v. Cincinnati N.O. & T.P. Ry. Co.*, 240 S.W. 429, 436 (1922)). However, "[t]his rule of cancellation applies only when inconsistency in a witness' testimony is unexplained and when neither version of his testimony is corroborated by other evidence." *Id.* Testimony will also be disregarded "if the testimony of such single witness is not of a cogent and conclusive nature, and 'if it is so indefinite, contradictory or unreliable that it would be unsafe to rest a conviction thereon.'" *Letner v. State*, 512 S.W.2d 643, 649 (Tenn. Crim. App. 1974) (quoting 23 C.J.S. Criminal Law § 903).

The defendant claims that the victim's testimony about the four assaults at the shop is contradicted by the victim's testimony at the preliminary hearing, which mentioned only two incidents of sexual abuse at the shop. The State correctly notes that the testimony at the preliminary hearing was used to impeach the victim at trial but it is not included in the appellate record nor was it offered as substantive evidence at trial. Accordingly, it has the weight of a prior inconsistent statement which the jury could consider in assessing the victim's credibility, but it does not constitute substantive evidence that only two incidents occurred. The victim testified consistently throughout trial regarding the four crimes the defendant committed against her at the shop. She described each event in detail, including

8

the location. The defense instructed her to look at two pages of the preliminary hearing testimony and asked her if she had testified to other offenses at the shop, to which she replied, "On here it says I didn't." The jury was able to use the victim's acknowledgment of these prior statements in weighing the victim's credibility against the defendant's. Such credibility determinations are entrusted exclusively to the jury. *Matthews*, 888 S.W.2d at 449. The victim's testimony at trial that the defendant touched her breasts and her groin and that the defendant forced her to perform fellatio and digitally penetrated her during times when she visited the shop was not "cancelled" by the use of the testimony from the preliminary hearing to impeach the victim. The prior statements do not render the evidence given at trial insufficient.

The next alleged inconsistency seized upon by the defendant is the victim's testimony, apparently given at the preliminary hearing, that an assault occurred in a "hallway." As noted above, the testimony regarding the "hallway" was admitted at trial only as impeachment. In any event, the victim clearly and succinctly explained at trial that she was using the term "hallway" as shorthand for the cleared area used as a pathway in a storage room crammed with supplies such as sheetrock. Numerous other witnesses, including the victim's mother, Ms. Fellows, and Mr. King, confirmed the existence of this walkway. Furthermore, the locale of the assault is not an element of the offense, and the failure of the State to prove that the assault occurred in a "hallway" would not result in the reversal of the defendant's conviction. *See State v. Wyrick*, 62 S.W.3d 751, 767 (Tenn. Crim. App. 2001) (concluding that any contradictory statements made by the witness "do not relate to her account of the offenses themselves").

The defendant also takes issue with the victim's testimony that the incident at the pool occurred while she was in school, because he claims that she testified at the preliminary hearing that it occurred after school let out. The defendant was not convicted of any crime as a result of his actions by the pool. Accordingly, any inconsistency regarding the timing of the pool incident in no way implicates the sufficiency of the evidence supporting any of the defendant's convictions. Nor does this minor inconsistency render the victim's testimony indefinite, contradictory, or unreliable. *See Letner*, 512 S.W.2d at 649.

Finally, the defendant claims that the victim's testimony regarding the aggravated sexual battery which occurred on the couch at the tire shop was inconsistent because she testified both that it occurred on her skin and that it occurred over her bra. The prosecutor questioned the victim about the assault:

> Q. Did he touch your boobs on top your clothes or on
> your skin?
> A. He went under my shirt. So my skin.

Q. All right. This may be a really silly question, but when you were 12 . . . did you wear a bra?

A. Yes.

Q. All right. Was he under your bra or on top of your bra?

A. On top of my bra.

The victim's testimony was, accordingly, that the defendant touched her skin under her shirt except in the area covered by her bra, where he touched her on top of her bra. This testimony is sufficient to support the verdict because she testified to an intentional touching of her intimate parts or the clothing covering the immediate area of her intimate parts and the touching could reasonably be construed as being for the purpose of sexual arousal. *See* T.C.A. § 39-13-501(6). Even if the victim's testimony had been self-contradictory, the touching of skin is not an element of the crime which the State was required to prove beyond a reasonable doubt. Accordingly, the evidence is sufficient to support the verdict.

We conclude that the defendant's other two convictions for rape of a child are supported by the victim's testimony regarding fellatio on the tractor tire and in the home garage. The defendant's third conviction for aggravated sexual battery is supported by the victim's testimony that he rubbed her groin in the bedroom. The defendant's conviction for assault, which consists of "[i]ntentionally or knowingly caus[ing] physical contact with another" which a reasonable person would regard as "extremely offensive or provocative," is supported by the victim's testimony that the defendant touched her breasts and kissed her in the kitchen of their home. *See* T.C.A. § 39-13-101(a)(3). Accordingly, we conclude that the evidence is sufficient to support the verdicts for each of the defendant's convictions.

## CONCLUSION

Based on the foregoing reasoning, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE

10