IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 6, 2009 Session

**STATE OF TENNESSEE v. MARVIN SENATHAN HALL, JR.**

**Direct Appeal from the Circuit Court for Tipton County**
**No. 5761     Joe H. Walker, III, Judge**

---

**No. W2008-00933-CCA-R3-CD  - Filed June 12, 2009**

---

The defendant, Marvin Senathan Hall, Jr., was convicted by a Tipton County Circuit Court jury of reckless aggravated assault, reckless endangerment with a deadly weapon, and felon in possession of a handgun and sentenced as a multiple offender to four years in the Department of Correction. On appeal, he argues that (1) the trial court erred in allowing evidence of his prior felony conviction to be presented to the jury when he offered to stipulate to such, and (2) the evidence was insufficient to support his convictions.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which J.C. MCLIN and CAMILLE R. MCMULLEN, JJ., joined.

J. Barney Witherington, IV, Covington, Tennessee, for the appellant, Marvin Senathan Hall, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and James Walter Freeland, Jr. and P. Neal Oldham, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case arises out of a verbal altercation between the defendant and David Brian Cartwright Ford, which escalated into Ford's being shot in the foot and other shots being fired toward Ford's house.  As a result, the defendant was indicted on charges of aggravated assault, reckless endangerment with a deadly weapon, and felon in possession of a handgun.  A trial was conducted on the matter on April 1, 2008.

**State's Proof**

The State first introduced, as a self-authenticating document, a certified copy of a judgment reflecting that the defendant pled guilty to the delivery of less than .5 grams of cocaine on December 1, 2004. The court instructed the jury that the prior judgment was used to prove an element of the charge felon in possession of a handgun and was not to be considered for any other purpose.

David Brian Cartwright Ford[1] testified that on the evening of August 12, 2007, he was on the front porch of his home on Lincoln Street with Felicia Nelson when he saw the defendant and two other men walking down the street past his house. Ford had known the defendant for two years but did not like him. At one time, he and the defendant were friends, but the defendant "got busted with some drugs" and thought that Ford, whose mother was a police officer, had "snitched" on him. Ford said the two men with the defendant were Benjamin Jones, who was also known as "B.J.," and Kevin Somerville, who was also known as "Tank." Ford recalled that it was getting dark outside when he first saw the men, and they had just walked past a street light when they stopped and the defendant and Ford started to argue. Ford was familiar with the defendant's voice because he had "been arguing with him for a couple of years" and was sure it was the defendant's voice.

Ford stated that he and the defendant had gotten into an argument earlier that day "uptown at the club" and that they argued every time they saw each other. He recalled that the defendant, Jones, and Somerville stopped across the street from his house, he and Nelson went down on the front lawn, and he and the defendant continued to argue. Ford saw Somerville pull a gun, shoot at him once, and run off. He did not see from where Somerville got the gun because it was difficult to see "the hands" due to the lighting. Ford saw the defendant "bend down beside the pine tree" and believed that Somerville, who was standing by the tree when he fired the gun, must have dropped the gun there, at which point the defendant picked it up and shot at him three or four times. Ford maintained he was able to see who shot at him because he "was looking directly at them because they [were] right across the street from [him]." Ford said that he did not see the gun in either of the men's hands, but saw the fire come out of the gun. He only saw one gun.

Ford testified that he was in shock when the first shot was fired and started to back up but could not run away. He acknowledged that three days after the shooting he gave a statement to police in which he said he started to run after Somerville shot at him, but he explained that "[he] tried to back up. Started to run, back up, how[ever] you want to put it." He recalled that Nelson ducked down after the first shot and estimated the second round of shots came within seconds of the first shot. Ford did not realize he had been shot in the foot until he tried to walk from the lawn back to the porch. He received treatment at the hospital and said his foot continues to cause him pain. The bullet shattered in his foot where he still has bullet fragments. About a month after the shooting, as Ford was soaking his foot in Epsom salt, "a little chrome piece just pushed itself" out of his foot. He gave the fragment to police investigators.

---

[1] We will refer to this witness as "Ford" to prevent confusion although he is interchangeably referred to by the witnesses and parties as "Cartwright," "Ford," and "Brian."

Ford testified that his friend, Michael Lewis, also known as "Mitch," was inside his house when the shooting occurred and that his house was struck with "about six bullet[s]." Nelson's vehicle was parked in front of his house, and the rear window was shot out. He recalled that during the shooting, people were walking in the neighborhood because someone had been shot in the chest "on the next street." Ford acknowledged that he had "drunk about a pint of . . . tequila" that day but was not intoxicated to the extent he could not remember what happened.

Felicia Nelson testified that the defendant was her cousin and that she had known Ford since 2000 or 2001. She recalled that, earlier on the day of the shooting, she was sitting in her vehicle "uptown" with Michael Lewis and Ford when Ford got out of the vehicle and into an altercation with the defendant. She said Ford attempted to make peace with the defendant, but the defendant told Ford he was not supposed to be around him. Nelson told Ford to get back in her vehicle because he could not force someone to be his friend, so they left and went to Ford's house. She was inside the house when Lewis told her that Ford and the defendant were outside arguing. She went outside to try and calm the defendant down. She recalled that only Ford, the defendant, and Jones were present, and the defendant had a pistol in his hand "down . . . to his side." She told him to put the gun away, and he put it behind his back "in the back part of his pants." Nelson assumed Ford would have seen the gun the defendant was holding but said "it was dark."

Nelson testified that Somerville "ran around from the house, . . . reached up behind [the defendant] and grabbed [the gun], and he started shooting." She thought she heard three or four shots but never saw the defendant fire a shot. Nelson noted that after Ford said he was shot, "[e]verybody just took off running." She noted that the rear window of her vehicle was shot out during the incident. Nelson said that she, Ford, and Lewis were intoxicated. She acknowledged that she did not want to testify because she thought the incident was "petty."

Kevin Somerville testified that he turned seventeen the day of the shooting and was walking down Lincoln Street that night with the defendant,[2] who is his cousin, Jones, and others. As they approached Ford's house, Ford and the defendant started arguing. Somerville knew Ford and had no bad feelings toward him. Somerville recalled that the defendant and Ford "kept saying they were going to kill each other," but he did not know who said it. The defendant handed Somerville a gun, he thought because "they [were] fixing to fight." Somerville presumed that Ford would have been able to see the gun in the defendant's hands. The defendant did not tell him to do anything with the gun except to hold it.

Somerville stated that he "shot in the air one time" but denied shooting at Ford, the house, or the white vehicle in front of the house. Afterwards, Somerville dropped the gun and started running. He heard three or four more gunshots but did not see who fired those shots. Somerville went to an apartment in the defendant's girlfriend's apartment complex where "four [or] five guys" had him wash his hands with bleach. The defendant was not one of those men; the defendant was outside talking to his mother and father.

---

[2] Somerville referred to the defendant by the nickname "June."

-3-

Somerville admitted that, in his prior statement to the police, he said, "[The defendant] handed me a gun and told me [that Ford] said he was going to kill me." However, he denied that the defendant said that to him and explained that there "[were] a lot of folks out there [and] . . . [t]hey just said it out loud." Somerville recalled that the street was full of cars and that several people were present, including approximately eight in his group. Somerville explained that he initially met up with the defendant that night because "everybody [was] on Hill Street" at a party.

**Defense Proof**

Michael Lewis testified that he was inside Ford's house the night of the incident. He heard an argument outside and, as he was coming out of the bathroom, heard approximately four gunshots. He noted that the first shot entered through the window into the house. He estimated that the shots were about a second apart and said that he "didn't pay attention" to whether there was a delay between the first and subsequent shots.

Benjamin Jones testified that he was with the defendant, the defendant's girlfriend, and his girlfriend the night of the incident. They heard about a shooting on Hill Street near the home of the defendant's girlfriend's aunt, so they went to see what had happened. However, the police told everyone to leave. Because they were unable to get back to the defendant's car, they started walking up Lincoln Street to Jones's car where he had left it earlier that day. Along the way, they saw Somerville who appeared to be mad, presumably because he was friends with the victim of the shooting on Hill Street. As they walked by Ford's house, Ford started saying things to the defendant, but they kept walking. Jones was aware the defendant and Ford had exchanged words earlier that night "uptown" and knew they did not like each other. Jones remembered seeing Nelson standing with Ford in his lawn but did not remember Nelson saying anything to the defendant. Jones estimated that there were four or five people in Ford's lawn, and thirty or forty people in the street at the time.

Jones said that, after they had walked "a little bit past [Ford's] house," they heard a gunshot and, thinking someone was shooting at them, took off running. Jones testified that he did not see Somerville shoot at Ford, did not see the defendant give Somerville a gun, and did not see the defendant with a gun. He said that the shots were fired consecutively, approximately a second apart, but he did not see who fired the shots. Jones saw Somerville at the defendant's girlfriend's apartment complex about thirty or forty minutes after the shooting but did not see him wash his hands with bleach. He said the defendant was also at the apartment complex until he was taken in for questioning.

The defendant testified that he, his girlfriend, Jones, and Jones's girlfriend were getting "ready to go out" the night of August 12, 2007, when they heard about an incident near the home of his girlfriend's aunt and went to check on her family. Because the police were trying to clear the area, they decided to take Jones's car and leave the defendant's car at the aunt's house. As they walked by Ford's house, Ford started shouting at him, and they "pass[ed] words back and forth." However, the defendant kept walking but looked over his shoulder to say things to Ford. The defendant noted that cars lined both sides of Lincoln Street and people were standing around, but only Ford and Nelson were standing in Ford's lawn. Nelson did not attempt to intervene.

-4-

The defendant testified that he saw Somerville on the corner of Lincoln Street and Hill Street and at no point saw him in front of Ford's house. He recalled that after they had passed Ford's house, gunshots rang out and they took off running. They got to Jones's car and went to the apartment complex of the defendant's girlfriend. Somerville was also at the complex but was not with the defendant. The defendant denied having a gun that night. He admitted that he and Ford had argued "uptown" earlier that evening and maintained that Ford was not trying to make peace with him. He said that Ford "evidently" did not like him, but he did not know why.

Lieutenant Allen Wilson with the Covington Police Department testified that he interviewed Somerville and that Somerville had bleach on his hands. In light of his law enforcement experience, Lieutenant Wilson said Somerville may have used bleach to disguise any evidence he had on his hands, in particular gunpowder residue. Lieutenant Wilson inspected the defendant's hands and did not notice any bleach on his hands. He did not test the defendant's hands for gunpowder residue, explaining that such a test was usually done when the police find someone on the scene and he did not talk to the defendant until "[s]ome hours" later. Four or five bullet casings were recovered from the scene across the street from where Ford would have been standing. No physical evidence was found linking the defendant to the shooting. Lieutenant Wilson said that the defendant told him that he and Somerville were together that night, but the defendant did not give a written statement.

## ANALYSIS

### I. Evidence of Prior Felony

The defendant first argues that the trial court erred in allowing evidence concerning his prior felony conviction when he offered to stipulate to such. Prior to voir dire, defense counsel requested a bench conference during which he told the court he was willing to concede that the defendant had a prior felony if the State would "omit that portion regarding his prior felony conviction and just call it unlawful possession of a handgun" when it read the indictment to the jury. The State responded that it had to prove every element of the crime and that the defendant could plead guilty to being a felon in possession of a handgun to prevent the jury from hearing of his prior conviction. Defense counsel then offered authority from a post-conviction case in which counsel was deemed to have performed deficiently for failing to stipulate to that defendant's status as a felon. The court ruled that the State could not mention the defendant's prior felony during voir dire and they would readdress the issue once the jury was empaneled.

After jury selection, the court conducted a jury-out hearing during which defense counsel said the defendant was willing to testify outside the jury's presence that he had prior felonies. The State responded that one of the elements it had to prove was that the defendant was a convicted felon. Defense counsel offered to have a bifurcated hearing where, if found guilty of possession of a handgun, the jury would later hear proof of the defendant's status as a felon. The trial court noted

that this case was different than the post-conviction case, <u>Bailey v. State</u>,[3] to which the defendant had alluded earlier, because <u>Bailey</u> involved a defendant on trial for an offense that was the same or very similar to his prior conviction; thus, the prejudicial effect was much greater. The court stated that "the fact that [the defendant's] been convicted of a drug offense should not have any prejudicial effect as far as the aggravated assault and reckless endangerment other than the fact that he does have a prior conviction, [which] . . . is a necessary element that the State has to prove[.]"

The trial court attempted to clarify whether defense counsel was offering to stipulate that the defendant had been convicted of a felony if the State excluded reference to the nature of the felony. Defense counsel responded, "[J]ust actually the bare fact that he's been convicted of a felony. . . . I don't see any reason why they should know about that either." The court noted that the State would then not be able to read Count 3 of the indictment, and defense counsel suggested that the State read it as "possession of a handgun." The State argued that it was not necessarily a crime to possess a handgun, which would confuse the jury, and that the statute required that it prove the defendant had previously been convicted of certain violent felonies or drug felonies, not just any felony.

The trial court asked if the defendant would agree to the State reading the indictment as "feloniously and knowingly possessing a handgun after being convicted of a felony." Defense counsel answered, "Yes, sir, we agree that he has a felony conviction, that he's a convicted felon. But, Your Honor, there's no reason for the jury to hear that he's a convicted felon." The court noted that it is not unlawful to possess a handgun without the presence of some other element, which in this case being that the defendant was a convicted felon. Defense counsel then asked that the State at least not be allowed to mention the specific crime of which the defendant had previously been convicted. The State responded that under the statute it had to prove that the defendant had previously been convicted of a drug felony or a crime of violence. Defense counsel requested "that [the State] just state that it is a drug offense, and then we will stipulate to [the defendant's] felony status and that it was, in fact, a felony drug offense." The State replied, "He's got several drug felonies which would qualify. We only put one of them. And it's something that we have to prove."

The trial court concluded:

[T]he Court finds that it's not unduly prejudicial against this defendant. There is a factual difference between the case of <u>Bailey v State</u>, which actually was a post-conviction case. And they found there that . . . defense counsel should have stipulated to a stipulation offered by the State. Of course, that's different here today. We don't have that same factual situation.

Further, the Court doesn't believe it's the same factual problem with regard to the underlying conviction. In <u>Bailey</u>, . . . what made counsel's decision not to stipulate egregious as far as the defendant was concerned was the fact that the

---

[3] <u>Willie Bailey v. State</u>, No. W2003-00977-CCA-R3-PC, 2004 WL 234744 (Tenn. Crim. App. Feb. 4, 2004), <u>perm. to appeal denied</u> (Tenn. May 24, 2004).

underlying felony for which he had been previously convicted was the exact same felony or very similar to what he was being tried for at the time, and that's not the case here with [the defendant].

I don't know of any procedure to do what defense counsel is asking, absent the agreement of the State. If there were a procedure you could show me where I could mandate that, then I'd be glad to consider it, because I think it is an interesting idea. But absent the State agreeing to what you're suggesting, I don't think I can order that to be done.

The defendant argues that the trial court committed reversible error in allowing the jury to hear evidence of his prior felony conviction. He asserts that under State v. James, 81 S.W.3d 751 (Tenn. 2002), the probative value of his prior conviction evidence was, as a matter of law, outweighed by the danger of unfair prejudice. He alleges that such error was not harmless because the State used proof of his prior felony conviction in a "calculated, repeated, and emphatic manner" and because the evidence was "certainly not overwhelming" in support of his guilt. The State responds that the trial court did not abuse its discretion in allowing the State to introduce evidence of the defendant's prior felony drug conviction.

The admission of evidence generally lies within the sound discretion of the trial court and will not be reversed on appeal absent a showing of an abuse of discretion. See State v. Gilliland, 22 S.W.3d 266, 270 (Tenn. 2000); State v. Edison, 9 S.W.3d 75, 77 (Tenn. 1999); State v. Cauthern, 967 S.W.2d 726, 743 (Tenn. 1998). As our supreme court has explained:

Because the term "discretion" essentially "denotes the absence of a hard and fast rule," we will reverse a decision to admit evidence "only when the 'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'"

Gilliland, 22 S.W.3d at 270 (quoting State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999)).

In James, the defendant was charged with felony escape, an element of which was that he was incarcerated for a felony at the time of his escape. To prevent the jury from learning of the specific felonies of which he had been convicted, the defendant offered to stipulate that he had been incarcerated for a felony at the time of the escape. The State did not agree to this stipulation and, at the trial, presented testimony which identified each of the defendant's felony convictions. Our supreme court concluded that, upon the defendant's stipulation that he was incarcerated for a felony at the time of his escape, the State could not present proof as to his specific felony convictions:

[W]e hold that when the sole purpose of introducing evidence of a defendant's prior convictions is to prove the status element of the offense, and when the defendant offers to stipulate his status as a felon, the probative value of the evidence is, as a matter of law, outweighed by the risk of unfair prejudice. Therefore, in this limited instance, the trial court should have accepted the defendant's stipulation in lieu of

disclosing the names or nature of his previous convictions, as the latter evidence had little probative value and was likely to provoke the jury's prejudice.

James, 81 S.W.3d at 762 (footnote omitted).

A panel of this court distinguished James in a similar issue in State v. Robert J. Wrigglesworth, Jr., No. M2005-01841-CCA-R9-CO, 2006 WL 2069430 (Tenn. Crim. App. July 26, 2006). In Wrigglesworth, the defendant was indicted for establishing a residence where a minor child also resided when he was "a violent sexual offender or sexual offender as defined by Tenn. Code Ann. § 40-39-202." Id. at *1. The defendant offered to stipulate that he had previously been convicted of a sex offense, and the trial court held that the State must accept his offer to stipulate and the fact of the defendant's prior conviction would be removed from the jury's consideration. Id. at *1-2. The court said that the jury would not be instructed why the defendant was not allowed to reside with a minor. Id. at *1. On appeal in that case, the defendant argued, relying on James, that the probative value of the evidence was outweighed by the risk of unfair prejudice when he offered to stipulate to the status element of the offense. Id. at *2. The State argued that it was effectively barred from carrying its burden of proving every element of the charged offense. Id. at *2. This court concluded:

In prosecuting James for felony escape, the State was required to prove that, at the time of his alleged escape, he was incarcerated for a felony. His offer to stipulate to this fact meant that the State did not have to present proof as to this element of the offense and had the practical effect of the jurors' not hearing proof as to the specific felonies of which he had been convicted. However, by the stipulation, James did not prevent the jurors from learning of his being incarcerated for a felony at the time of the alleged escape, for this status was an element of the offense. In the present appeal, the State was required to prove that the defendant was convicted not just of a felony, as had been the case in James, but that he had been convicted of a violent sexual offense or sexual offense, as defined by Tennessee Code Annotated section 40-39-202. The trial court erred in concluding that, by his stipulation, the defendant could remove this element of the indictment from the jury's consideration and, thus, prevent it from learning of the conviction or even of the stipulation itself. Since the defendant's status as a convicted sex offender is an element of the offense with which he is charged, the jury should be told of his specific stipulation and the State then would not be allowed to present proof of the offense for which he had been convicted.

Id. at *4. Following this reasoning, a defendant can offer to stipulate to the elements of an offense, but by doing so cannot prevent the jury from learning of an element of the offense or the stipulation.

Before we begin our analysis, we find it pertinent to note that the present appeal is both distinguishable from and reconcilable with Bailey, the post-conviction case relied upon by the defendant in arguing his position at trial. In Bailey, a panel of this court determined that it was deficient performance, under the circumstances of that case, for defense counsel not to stipulate that "at the time of the alleged offense of felony possession of a handgun, the Petitioner had been

convicted of a felony that would prohibit him from carrying a weapon under Tennessee Code Annotated section 39-17-1307(b)(1)(A), (B)." Bailey, 2004 WL 234744, at *5. The panel noted that "[b]y so stipulating, Counsel would have prevented the jury from learning that the Petitioner's prior felony conviction was for robbery, the same crime for which he was on trial." Id. From the court's use of the phrases "[u]nder the circumstances of this case" and "in this case," it is not clear whether the panel would have determined that counsel performed deficiently had that defendant's prior felony not been the same as the offense for which he was on trial, or if it had been a drug offense instead of a "felony involving the use or attempted use of force, violence or a deadly weapon." In fact, the defendant in this case would have conceivably been disadvantaged by the use of a general stipulation like that proposed in Bailey because the jury would have been left with the suspicion that the defendant had previously committed an offense of violence, which arguably seems more ominous than a drug offense.

In this case, the State had to prove that the defendant had previously been convicted of not just a felony, but a crime of violence or drug offense. As set out above in detail, the defendant's attempted stipulations did not encompass the elements the State had to prove, which would have left the jury with a lack of coherence as to the offense. It appears that toward the end of the bench conference, the defendant may have agreed to stipulate to his status as a felon previously convicted of a drug offense. However, in light of the confusing and lengthy exchange leading up to the offer to stipulate and the exact wording used by defense counsel, it seems that he may have been offering to stipulate but did not think the stipulation would be made known to the jury. If the defendant indeed offered to stipulate to his status as a felon previously convicted of a drug offense, then, as discussed in Wrigglesworth, the jury should have been told of his specific stipulation and the State then would not have been allowed to present proof of the defendant's previous conviction.

In any event, even if the trial court erred in allowing the State to present proof of the defendant's prior felony conviction, we conclude that such error was harmless. The offenses for which the defendant was on trial were not drug-related and therefore did not carry the same prejudicial danger as in Bailey where that defendant was on trial for aggravated robbery and had a prior conviction for robbery. Moreover, the court gave a lengthy admonishment to the jury at the State's introduction of the prior judgment regarding the use of the defendant's previous conviction, and the State reiterated in its closing argument that the jury was only to consider the prior conviction as an element of the offense of being a convicted felon in possession of a handgun and for no other purpose. In the absence of evidence to the contrary, we presume the jury followed the trial court's instruction. See Gilliland, 22 S.W.3d at 273.

## II. Sufficiency

The defendant argues that the evidence is insufficient to support his convictions. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the

findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A person commits reckless aggravated assault who recklessly commits an assault and uses or displays a deadly weapon. See Tenn. Code Ann. § 39-13-102(a)(2)(B) (2006).

> "Reckless" means that a person acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint[.]

Id. § 39-11-106(a)(31).

In the light most favorable to the State, the evidence shows that Somerville used the defendant's gun to shoot once, after which he dropped the gun and ran. After Somerville ran away, he heard three or four more shots ring out. Ford saw the defendant bend down near where Somerville had been standing when he fired the gun and then shoot at him three or four times. Ford was shot in his foot which still causes him pain. Bullet fragments remain lodged in his foot. The defendant argues that no physical evidence linked him to the shooting. However, a defendant may be convicted upon the uncorroborated testimony of one witness, see State v. Wyrick, 62 S.W.3d 751, 767 (Tenn. Crim. App. 2001); Letner v. State, 512 S.W.2d 643, 649 (Tenn. Crim. App. 1974), and assessing the credibility of the witnesses is the province of the jury. See Pappas, 754 S.W.2d at 623. This evidence was sufficient to convict the defendant of reckless aggravated assault.

"A person commits an offense who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." Tenn. Code Ann. § 39-13-103(a). When reckless endangerment is committed with a deadly weapon, it is a Class E felony. Id. § 39-13-103(b). In the light most favorable to the State, the evidence shows that Nelson was in the lawn with Ford when the shooting occurred. Ford's friend, Lewis, was inside Ford's house when the shooting occurred and the house was struck with several bullets, including at least one shot that entered into the house. There were also a number of passersby on the street when the shooting took place. This evidence was sufficient to convict the defendant of reckless endangerment with a deadly weapon.

Relevant to this case, in order to establish the crime of being a felon in the unlawful possession of a handgun, the State had to prove that: (1) the defendant possessed a handgun and (2) had been previously "convicted of a felony drug offense." Tenn. Code Ann. § 39-17-1307(b)(1)(B) (2006). The State introduced a copy of the judgment showing the defendant was convicted in 2004 of delivery of less than .5 grams of cocaine, a Class C felony, and the defendant acknowledged he was the person identified in that judgment. At trial, Nelson testified that she saw the defendant with a gun in his hand; Ford testified that even though he did not see the gun in the defendant's hand, he saw the fire coming out of the gun; and Somerville testified that the defendant handed him a gun. This evidence was sufficient to prove the defendant was a felon in possession of a handgun.

## CONCLUSION

Based on the aforementioned authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE

-11-