# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### February 4, 2014

## STATE OF TENNESSEE v. DEVIN JAY DAVIS

**Appeal from the Circuit Court for Chester County**
**No. 11CR49    Honorable Donald H. Allen, Judge**

_____

**No. W2012-02195-CCA-R3-CD  - Filed April 21, 2014**

_____

The Defendant, Devin Jay Davis, was convicted by a Chester County jury of criminally negligent homicide and aggravated child abuse and neglect, for which he received an effective sentence of twenty years. In this appeal, the Defendant argues that the evidence is insufficient to sustain his conviction for aggravated child abuse and neglect, the jury's verdicts in count one and count two are fatally inconsistent, and his convictions violate double jeopardy. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Ryan B. Feeney, Selmer, Tennessee, for the Defendant-Appellant, Devin Jay Davis.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; James G. Woodall, District Attorney General; and Brian Gilliam, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

This appeal stems from the death of the Defendant's six-month old son, Clever McCarley ("the victim"). The Defendant and his girlfriend, Stephanie McCarley, were subsequently indicted on charges related to the victim's death.

**State's Proof.** On April 21, 2011, Stephanie McCarley brought her six-month old son, the victim in this case, into a primary care clinic in Henderson, Tennessee. Charles Rickard, a family nurse practitioner that operates the clinic, testified that the victim "appeared to be actively dying" when Ms. McCarley arrived with him at the clinic. His staff

was "alarmed by [the victim]'s appearance" and immediately put him in an exam room. Mr. Rickard recalled that the victim was still breathing, but had a slow heartbeat and "appeared to be already dead by looking at him." He explained that the victim's "soft spot in his head [was] sunken. His skin appeared to be stretched over the skeleton. . . . The corneas of his eyes were very dry and cloudy looking. He didn't blink or make eye contact at all." The clinic staff called an ambulance and had the victim transported to the Madison County General Hospital "within 22 minutes" after the victim's arrival at the clinic. The victim died shortly after arriving at the hospital.

Mr. Rickard testified that he saw the victim one time prior to the victim's death when Ms. McCarley brought the victim in for symptoms of a cold. The victim was eight days old at that visit, and Mr. Rickard described the victim as "perfectly healthy" and "normal in every way" at that time. The victim weighed seven pounds and seven ounces at eight days old, a normal weight for his age. Mr. Rickard stated that when the victim returned at six-months old, however, he was "very small" and weighed only nine pounds and five ounces. Mr. Rickard opined that he should have weighed approximately nineteen pounds at that age. On cross-examination, Mr. Rickard acknowledged that he did not give the victim a newborn screen at his first visit, but stated that he advised Ms. McCarley to bring him back at a later date to complete the screen. He denied that he examined the victim at two-months old.

Jason Crouse, an investigator with the Chester County Sheriff's Office, was assigned to investigate the death of the victim. On the evening of the victim's death, Investigator Crouse went to the home of the Defendant and Ms. McCarley, the victim's parents, to talk about the victim's death. Ms. McCarley was the only person at the home that evening. She consented to a search of the home and gave an informal statement to Investigator Crouse. Investigator Crouse explained that Ms. McCarley was not in custody at the time of her statement, and was not charged with the victim's death until several months later after police obtained the results of the victim's autopsy. During her initial statement to Investigator Crouse, she said that only she and her children lived in the home. She also stated that she believed the victim's father was a man from Mississippi. Additionally, she told Investigator Crouse that she had taken the victim to the doctor on two previous occasions: "[o]nce at two weeks and shortly after that to have [his] shots."

Over the course of the investigation, Ms. McCarley gave two more written statements to Investigator Crouse. Her first written statement was taken on April 27, 2011. At that interview, she admitted that she lied about the identity of the victim's father. She confirmed that the Defendant was the victim's father, and explained that she lied because the Defendant "didn't want anybody to know he was [the victim]'s father." She also told Investigator Crouse that she took the victim to see Mr. Rickard when he was two months old because he had an upper respiratory infection and that Mr. Rickard prescribed an antibiotic. Mr. Rickard

denied that he saw the victim at two months old and Investigator Crouse was unable to find any medical records to confirm Ms. McCarley's story. Ms. McCarley gave a second written statement on July 18, 2011, after she had been arrested and charged with murder and aggravated child abuse. Investigator Crouse recalled that the second written statement was fairly consistent with the first written statement, but provided a few additional details. Investigator Crouse acknowledged, however, that Ms. McCarley "told a lot of lies" over the course of the investigation and did not give "satisfactory explanations that made sense." He further agreed that Ms. McCarley never indicated that the Defendant had any part in the victim's death until after her arrest.

On May 24, 2011, Investigator Crouse took a written statement from the Defendant. In the statement, which was read into evidence at trial, the Defendant described the victim and the circumstances surrounding his death as follows:

> I have been in [the victim]'s life since he was born. [Ms. McCarley] and I have had an up and down relationship for almost three years. I know that I am Tyler's father and I have always felt like I was [the victim]'s father. I always treated him like he was mine. [The victim] always seemed to be [a] healthy, happy[,] and strong baby. Any time I fed him, he ate well. I noticed that [the victim] had a rash on his face and I told [Ms. McCarley] she needed to take him to the doctor. I think she did take him to the doctor because she had some cream to put on his face. [Ms. McCarley] has always been a low spirited person and I didn't notice any change in that. On [April] 20th, I was mowing yards and I didn't notice anything about [the victim] that day. I was home on [April] 21st after about 10:00 a.m. I noticed that [the victim] didn't have any energy and I told [Ms. McCarley] he needed to go to the doctor. She called and made an appointment and Gwen Smith took them to the doctor. I stayed home with the other kids. [Ms. McCarley] called me and said they were rushing him to the hospital. After I heard he had died, I found a baby sitter and got to the hospital. I think I was at the hospital for about four hours. I talked to a doctor who told me [the victim] had congestive heart failure. I went to my mother's house that night because I needed some time to myself.

Jamie Blalock, a case manager for the Department of Children's Services, testified that she was on call in Madison County on April 21, 2011, and was asked to respond to the victim's case at the Madison County General Hospital. When she arrived at the hospital, the victim had already died. She took a number of photographs of the victim's body, which were introduced into evidence and published to the jury, to show his condition at the time of his death.

-3-

Stephanie McCarley, the victim's mother, testified that the Defendant is her boyfriend and the victim's father. Ms. McCarley testified that the Defendant was happy about the victim's birth, but "would always say that [the victim] was too small and that he needed [his mother]." She maintained that she "did most of everything" to take care of the victim during his life, and the Defendant did very little. She recalled that the Defendant fed the victim only a few times during his life, rarely held him, and never changed his diapers. She estimated that she fed the victim six to seven bottles of formula per day in addition to baby cereal. She noticed that he began to throw up on a regular basis when he was three or four months old, and that it got progressively worse over time. In addition, she observed that the victim "just kind of stayed the same. He never really changed." She testified that she told the Defendant about the victim's condition when he was about five months old, and mentioned taking the victim to the doctor on several occasions but the Defendant always rejected the idea She maintained that she did not push the matter further because she and the Defendant had an abusive relationship, which impacted how she cared for the children.

On April 20, 2011, the day before the victim's death, Ms. McCarley became very concerned about the victim because he felt cold to the touch, acted "kind of sluggish," and did not cry as he usually would. She told the Defendant that they should take him to the doctor, but the Defendant refused because he was afraid that the other children would be taken from them. Ms. McCarley "wrapped [the victim] up because he was cold," and continued to check on him throughout the day but his condition did not improve. The next morning, Ms. McCarley "kept pushing the issue about taking him to the doctor" and called Mr. Rickard's clinic to make an appointment for that afternoon. The Defendant called a friend, Gwen Smith, to take Ms. McCarley and the victim to the appointment. Ms. McCarley testified that she feels responsible for the victim's death and believes the Defendant is equally responsible. She acknowledged that she intends to enter pleas of guilty to second degree murder and aggravated child abuse for her involvement in the victim's death.

Jennifer McCarley[1], Stephanie McCarley's sister, testified that she first met the victim when the victim was three or four days old and that he appeared healthy at that time. She saw the victim several times over the next few months and stated that he always appeared healthy until April 2011. Jennifer explained that she was concerned about the victim's weight and thought he "just looked small." She questioned Ms. McCarley about his size, but Ms. McCarley told her that she had already taken the victim to see Mr. Rickard and had adjusted the victim's diet as he advised. Jennifer did not see the victim again before his death.

---

[1] Because Jennifer and Stephanie McCarley share the same last name, we will refer to Jennifer McCarley by her first name so as to avoid confusion.

Dr. Thomas Deering, a forensic pathologist and medical examiner, testified as an expert witness in the field of forensic pathology.[2] Dr. Deering testified that he performed the autopsy on the victim on April 22, 2011, one day after the victim's death. Dr. Deering stated that externally the victim's body looked "emaciated, very thin." He noted that the "belly look[ed] bloated or rounded. The head look[ed] rather large in comparison to the size of the body," and the victim's spine was visible and "actually protrude[d] through the skin." Additionally, the victim had lanugo hair on his back, which Dr. Deering opined "can be an indication of severe malnutrition" in a child this age. Dr. Deering's internal examination of the victim further confirmed the exterior appearance of malnutrition. Specifically, the victim had no body fat, suffered from thymic involution, and had evidence of fluid leakage from the liver, which are all indicators of malnutrition. Dr. Deering found stool in the large intestine, which indicated that the victim was being fed at least occasionally, and opined that in a child receiving some nutrition it would likely take "months to get to this place." Dr. Deering agreed that the results of the autopsy would be consistent with the victim being fed but constantly throwing up his food. He noted, however, that such a condition is not "life threatening . . . in and of itself[,]" and is treatable.

Based on his findings, Dr. Deering concluded that the victim's "cause of death is complications of chronic malnutrition." As for the manner of death, Dr. Deering reasoned that "[n]o underlying cause[] other than insufficient feeding was found for the malnutrition" and concluded, "the manner of death[,] therefore[,] is homicide." Dr. Deering clarified that

> when a forensic pathologist uses the word homicide, it doesn't necessarily imply intent and it is not a synonym for murder. It simply means that someone died directly at the hands of another or that someone who had responsibility of a person who couldn't take care of themselves did something or failed to do something that led to the death of an individual. Again, it doesn't necessarily imply any intent. It is primarily a statistical categorical tool.
>
> . . . .
>
> [Here], categorically speaking, this is a child that cannot take care of [himself] . . . . There is a caregiver who has responsibility for that and since that was not done then there is an individual whose actions resulted in the death of this child and it is therefore a homicide.

On cross-examination, Dr. Deering agreed that there are other theoretical alternatives for the victim's cause of death but reiterated that malnutrition is the best explanation in his opinion.

---

[2] The defense stipulated to the qualifications of Dr. Deering as an expert in this case.

He agreed that nothing in his findings indicated that "the parents were willfully starving [the victim]," but opined that it "would be neglectful of them to not seek help for [the victim] over a long period of time when there was obviously something wrong." He also noted that "in [his] opinion . . . a normal person seeing [the victim] would be concerned."

**Defense's Proof.** Dr. Keith Perkins, Jr. testified on behalf of the defense as an expert in the field of general pediatrics. He reviewed the victim's medical records and autopsy report, and testified that while chronic malnutrition could be "a possibility" as the victim's cause of death, there are other causes that should not be excluded. He opined that the victim could have been suffering from an undiagnosed chronic illness, which is not always apparent to a caregiver, and noted that the victim never underwent a newborn screen to test for such illnesses. He listed a number of other disorders or illnesses that the victim could have suffered from based on the victim's medical record and autopsy report, and agreed that "chronic malnutrition does not necessarily [reveal] anything about the mother or father's care of this baby[.]" On cross-examination, Dr. Perkins conceded that he has never conducted an autopsy nor received any training on interpreting the results of an autopsy. He agreed that many of the findings in the autopsy, such as the presence of lanugo hair and the lack of body fat, are indicators of malnutrition. When asked whether he "would make a finding differently than that of Dr. Deering," Dr. Perkins responded, "[p]robably not."

Gwen Smith testified that she has been friends with the Defendant for "quite a while" and met Ms. McCarley in 2004 or 2005 through her friendship with the Defendant. Prior to the victim's birth, the Defendant and Ms. McCarley lived with Ms. Smith. At the time, Ms. McCarley had a child named Steffon, fathered by another man, and was pregnant with a second child named Tyler, fathered by the Defendant. Ms. Smith testified that she observed the Defendant interact with the children and believed that he was an appropriate caregiver and loving father. She recalled that on April 21, 2011, the Defendant called her and asked her to give Ms. McCarley and the victim a ride to the doctor. Ms. Smith drove the two to Mr. Rickard's clinic and returned later to pick them up. Ms. McCarley informed Ms. Smith that the victim had been taken to the hospital in Jackson, but that she did not need a ride to Jackson because a family member was going to take her. Later that day, the Defendant called Ms. Smith again and asked her to drive Ms. McCarley to the hospital to be with the victim. Ms. Smith testified that to her knowledge Ms. McCarley had a pre-paid cell phone paid for by the Defendant and another "Safe Link" phone provided to individuals on public assistance for emergency needs. She had little interaction with Ms. McCarley outside of the children, but stated that she would have "definitely" taken Ms. McCarley to the doctor if she had asked. Ms. Smith saw the Defendant at the hospital after the victim's death and recalled that he was "[d]istraught [and] [q]uiet."

The Defendant testified that he and Ms. McCarley had been in a relationship for nearly four years and were the primary caregivers to three children: Steffon, Tyler, and the victim. The Defendant clarified that Tyler and the victim are his biological sons and that Steffon is Ms. McCarley's son from a prior relationship. The Defendant testified that he was the primary financial provider for the family. He paid the bills, fed and clothed the children, and purchased groceries. Additionally, he provided a pre-paid AT&T phone for Ms. McCarley and bought minutes each week for her use. He also testified that she had a second "government phone" for emergency use. The Defendant testified that he cared for all of the children as his own, and that he loved the victim very much. The Defendant denied that he favored Tyler over the victim but acknowledged that he worked more after the victim was born and therefore did not spend as much time with the victim. He denied that he told Ms. McCarley that he did not want anything to do with the victim. He also denied that he told her to lie to hospital staff or police about the identity of the victim's father or the fact that they lived together.

The Defendant maintained that he did not notice anything wrong with the victim prior to April 21, 2011. He agreed that the victim was "a little small" but also thought he was "lanky and long." He denied that Ms. McCarley expressed concern about the victim on the day before his death, and testified that he "wasn't even at home" that day. On April 21, 2011, the Defendant noticed that the victim had "no energy" and "wasn't moving or gooing or [doing] the things he usually do[es]." He asked Ms. McCarley what was wrong with the victim and she told him that the victim was cold to the touch and sick. He testified that he told Ms. McCarley to call the doctor or Mr. Rickard, and that Ms. McCarley called the clinic to make an appointment. The Defendant was at home with the two other children when Ms. McCarley called from the hospital and told him that the victim had died. He took the other children to Ms. McCarley's mother's house and went to the hospital.

The Defendant testified that he and Ms. McCarley had a "rocky" relationship but insisted there was "never any abuse." He described her as a "compulsive liar" but about "petty stuff" like not washing the dishes. He testified that he had no reason to believe that she would lie about the children's health. He recalled that Ms. McCarley told him that she had taken the victim to see Mr. Rickard "about the skin rash on his face and a few more times about sickness or something like that . . . [but] [he] didn't check up on her or anything like that." The Defendant testified that he does not blame Ms. McCarley for the death of the victim, and has "no idea" why the victim died. He maintained that Ms. McCarley's testimony at trial was the first time he had heard that the victim was constantly throwing up, and stated that he never saw the victim covered in vomit. He testified that had he seen or heard that the victim was throwing up regularly, he would have taken him to the doctor and adjusted his diet. He testified that he was a "responsible" and "loving" father, and does not feel like he neglected or abused the victim.

-7-

Following deliberation, the jury convicted the Defendant of criminally negligent homicide, a Class E felony, and aggravated child abuse and neglect, a Class A felony. On May 4, 2012, the trial court sentenced the Defendant to concurrent sentences of four years for criminally negligent homicide and 20 years for aggravated child abuse. The Defendant filed a motion for new trial on May 10, 2012, and a hearing was held on September 28, 2012. The trial court denied the motion on October 10, 2012, after which the Defendant filed a timely notice of appeal to this Court.

## ANALYSIS

On appeal, the Defendant argues that the evidence is insufficient to sustain his conviction for aggravated child abuse and neglect, asserting that the only evidence of the Defendant's guilt was presented by "a witness who was unreliable as a matter of law." Additionally, he argues that the jury's verdicts are "fatally inconsistent" and violate double jeopardy. The State responds that the evidence is sufficient to support the Defendant's convictions, and the jury's verdicts are not inconsistent and do not violate double jeopardy. Upon review, we agree with the State.

**I. Sufficiency of the Evidence.** The Defendant asserts that the evidence is insufficient to support his conviction for aggravated child abuse and neglect. Specifically, the Defendant attacks the State's proof regarding the "knowing" element required for aggravated child abuse and neglect. To support his contention, he argues that the sole proof establishing his culpable mental state was presented through the testimony of the victim's mother, Stephanie McCarley, who he maintains is "unreliable as a matter of law." He notes that her testimony contradicted other fact witnesses and that while testifying she admitted that she lied on numerous occasions during the investigation. Based on these allegations, the Defendant urges this Court to find her testimony insufficient to support the Defendant's conviction.

We begin by noting that the State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn.

1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

The Defendant was convicted of aggravated child abuse and neglect as provided in Tennessee Code Annotated section 39-15-402. The Code provides that child abuse or neglect occurs when any person "knowingly, other than by accidental means, treats a child . . . in such a manner as to inflict injury[.]" T.C.A. § 39-15-401(a) (2012). A person acts "knowingly" with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. T.C.A. § 39-11-106(20). Where the act of abuse or neglect "results in serious bodily injury to the child," the offender commits aggravated child abuse or neglect.[3] T.C.A. § 39-15-402(a)(1). By its terms, "the statute requires that the act of treating a child in an abusive or neglecting manner must be knowing conduct." State v. Ducker, 27 S.W.3d 889, 897 (Tenn. 2000). However, the knowing mens rea does not also apply to the ensuing result of that conduct. Id. "[I]f an injury results from knowing abuse or neglect, the actor has committed child abuse" whether or not he is aware that the conduct will result in injury to the child victim. Id.

In the instant case, the evidence at trial established that the victim was six-months old at his time of death and weighed only a few pounds more than when he was born. Dr. Deering testified that the victim's body looked "emaciated" and extremely small for his age. He also opined that "a normal person seeing this child would be concerned." Indeed, Ms. McCarley's sister, Jennifer, testified that she was very concerned about the victim's small size when she saw him in early April and even questioned Ms. McCarley about his health. Dr. Deering agreed that the victim's cause of death through chronic malnutrition was consistent with Ms. McCarley's account that the victim was throwing up his food during the last few months of his life. However, he explained that such a condition is treatable and not life threatening in and of itself. Ms. McCarley testified that the Defendant had witnessed the victim spitting up his food and that she had conveyed her concerns about the victim's physical condition to the Defendant on several occasions. Ms. McCarley further testified that the Defendant rejected her suggestion to seek medical help for the victim multiple times because he was worried that they would lose custody of the children.

---

[3] "Serious bodily injury" is bodily injury that involves a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty, or a broken bone in a child who is eight (8) years of age or less. T.C.A. § 39-11-106(34).

Despite this evidence, the Defendant urges this court to disregard the testimony of Ms. McCarley and hold that the evidence fails to establish that the Defendant acted knowingly to neglect the victim. In that regard, we note that we have generally held that "uncorroborated testimony of a single witness will support a defendant's conviction." State v. Lee Roy Gass, No. E2000-00810-CCA-R3-CD, 2001 WL 767011, at *7 (Tenn. Crim. App. July 3, 2001) (citing State v. Anthony Lynn Wyrick, No. E1999-02206-CCA-R3-CD, 2001 WL 472849, at *13 (Tenn. Crim. App. May 4, 2001); Letner v. State, 512 S.W.2d 643, 649 (Tenn. Crim. App. 1974)). However, "[i]t is a rule of law in Tennessee that contradictory statements by a witness in connection with the same fact cancel each other." State v. Matthews, 888 S.W.2d 446, 449 (Tenn. Crim. App. 1993) (citing Taylor v. Nashville Banner Pub. Co., 573 S.W.2d 476, 482 (Tenn. Crim. App. 1978)). This rule of cancellation only applies when "inconsistency in a witness'[s] testimony is unexplained and when neither version of his testimony is corroborated by other evidence." Matthews, 888 S.W.2d at 450 (citing Taylor, 573 S.W.2d at 483). This court will only disregard testimony "if it is so indefinite, contradictory or unreliable that it would be unsafe to rest a conviction thereon." Letner, 512 S.W.2d at 649.

> The question here is not one of the credibility of a witness or the weight of evidence; but it is whether there is any evidence at all to prove the fact. If two witnesses contradict each other, there is proof on both sides, and it is for the jury to say where the truth lies. But if the proof of the fact lies wholly with one witness, and he both affirms and denies it, and there is no explanation, it cannot stand otherwise than unproven. For his testimony to prove it is no stronger than his testimony to disprove it, and it would be mere caprice in a jury upon such evidence to decide it either way.

Matthews, 888 S.W.2d at 449-50 (citing Johnston v. Cincinnati N.O. & T.P. Ry. Co., 240 S.W. 429, 436 (1922)).

Based on our review of the record, we decline the Defendant's invitation to "intrude into the province of the trier of fact and disturb its assessment of a witness'[s] credibility." See Lee Roy Gass, 2001 WL 767011, at *7. Indeed, Ms. McCarley is not an ideal witness. As noted by the Defendant, she was dishonest throughout the investigation and admitted on the stand that she had been untruthful to hospital staff and Investigator Crouse. Nevertheless, Ms. McCarley's testimony at trial regarding the circumstances of the victim's death was not "so indefinite, contradictory or unreliable that it would be unsafe to rest a conviction thereon." See Letner, 512 S.W.2d at 649. She provided explanations for her prior inconsistencies and affirmed that her testimony at trial was true. Further, she was subjected to rigorous cross-examination, revealing many of her untruthful statements, which allowed the jury to fully consider her credibility and assign to her testimony the weight they deemed

appropriate. Under these circumstances, "it is for the jury to say where the truth lies." See Johnston, 240 S.W. at 436.

Moreover and contrary to the Defendant's assertions, the jury was presented with ample evidence that corroborated Ms. McCarley's testimony. As noted above, multiple witnesses testified about the victim's physical condition prior to his death and expressed concern for his health based upon his appearance. Additionally, the jury viewed photographs of the victim's body at the time of death and heard expert medical testimony about the victim's obvious signs of malnutrition. After hearing all of the proof in this case, including the contradicting testimony of Ms. McCarley and the Defendant, the jury chose to accredit the testimony of Ms. McCarley over that of the Defendant, as was their prerogative. We will not reweigh or reevaluate this evidence on appeal. See Henley, 960 S.W.2d 578-79. Based on the proof presented, a rational juror could conclude beyond a reasonable doubt that the Defendant knowingly decided not to seek medical help for the victim, which resulted in the victim's death. Consequently, the Defendant is not entitled to relief on this issue.

**II. Inconsistent Verdicts.** The Defendant asserts that the jury's verdicts in count one and count two are "inconsistent and irreconcilable," and as such the Defendant should be granted a new trial. "Inconsistent verdicts exist when a jury convicts a defendant of one offense and acquits [him] of another offense even though 'both counts stem from the same criminal transaction.'" State v. Cynthia Finch, No. E2011-02544-CCA-R3-CD, 2013 WL 6174832, at *13 (Tenn. Crim. App. Nov. 22, 2013) (quoting Wiggins v. State, 498 S.W.2d 92, 94 (Tenn. 1973)). Contrary to the Defendant's assertion, it is well-established in this state that "consistency between verdicts on separate counts of an indictment is not necessary." Wiggins, 498 S.W.2d at 93. Appellate courts will not disturb seemingly inconsistent verdicts as doing so would require inappropriate speculation into the jury's reasoning. Id. Rather, each count in an indictment is treated as a separate indictment, and so long as there is sufficient evidence to support the defendant's conviction, the verdicts will be upheld. Id. at 93-94; see also, State v. Venita Michelle Burchell, No. M2001-02153-CCA-R3-CD, 2002 WL 31520651, at *6 ("[T]his court is untroubled by the apparent inconsistency in the verdicts [for aggravated child abuse and criminally negligent homicide] given the sufficiency of the evidence on both counts.") (citing Wiggins, 498 S.W.2d 92; State v. Hayes, 7 S.W.3d 52, 57 (Tenn. Crim. App. 1999)). Accordingly, the only remaining question is whether the evidence is sufficient to support the Defendant's conviction for criminally negligent homicide.

We conclude that the State presented sufficient evidence to support the Defendant's conviction of criminally negligent homicide. The evidence established that the victim exhibited numerous signs of malnutrition and declining health in the weeks preceding his death, yet the Defendant did not seek medical help for the victim and dissuaded Ms.

McCarley from doing the same. Viewed in the light most favorable to the State, a rational juror could conclude that the Defendant knew or should have known that the victim needed immediate medical attention and his failure to seek medical attention in a timely manner was the direct and proximate cause of the victim's death. Thus, the evidence is sufficient to sustain the Defendant's convictions on both counts, and he is not entitled to relief on this issue.

**III. Double Jeopardy.** The Defendant argues that his convictions for aggravated child abuse and neglect and criminally negligent homicide violate the state and federal prohibitions against double jeopardy. The Defendant offers two alternatives to support his contention. First, he asserts that he was prosecuted for an offense in count two, aggravated child abuse and neglect, after being acquitted of the same offense in count one. Alternatively, he asserts that he received multiple punishments for the same offense. In either case, the Defendant maintains that his convictions violate double jeopardy and entitle him to relief.

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides that "[n]o person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb." Likewise, the Tennessee Constitution also protects against double jeopardy convictions, providing that "no person shall, for the same offence, be twice put in jeopardy of life or limb." Tenn. Const. art. I, § 10. Three fundamental protections are encompassed in the principle of double jeopardy: "(1) protection against a second prosecution after an acquittal; (2) protection against a second prosecution after conviction; and (3) protection against multiple punishments for the same offense." State v. Thompson, 285 S.W.3d 840, 847 (Tenn. 2009) (citations and internal quotation marks omitted).

The Defendant's first alternative argument implicates the first category of protection – protection against a second prosecution after an acquittal. However, as we interpret it, the Defendant's argument is essentially a second rehashing of his assertion that the jury's verdicts are inconsistent. Stated another way, the Defendant argues that because the jury convicted him of the lesser included offense of criminally negligent homicide rather than first degree felony murder during the perpetration of aggravated child abuse in count one, the jury necessarily acquitted him of aggravated child abuse. Thus, according to the Defendant, he was subjected to a second prosecution for aggravated child abuse in count two after being acquitted of the same in count one. However, such an argument again asks this court to inquire into the reasoning of the jury in reaching their decision in count one. As discussed at length above, we refuse to speculate into the jury's rationale. See, e.g., State v. Derek T. Payne, No. W2001-00532-CCA-R3-CD, 2002 WL 31624813 (Tenn. Crim. App. Nov. 20, 2002) (refusing to inquire into the jury's reasoning where the Defendant was convicted of second degree murder as a lesser included offense of felony murder and convicted of the

underlying felony). Instead, the proper inquiry is whether the Defendant's dual convictions for criminally negligent homicide and aggravated child abuse violate double jeopardy. Thus, we turn to the Defendant's second alternative argument, that he received multiple punishments for the same offense.

"Whether multiple convictions violate double jeopardy is a mixed question of law and fact, which we review de novo without any presumption of correctness." State v. Watkins, 362 S.W.3d 530 (Tenn. 2012) (citing State v. Thompson, 285 S.W.3d 840, 846 (Tenn. 2009)). The focus of the analysis of whether a defendant may receive multiple punishments in a single prosecution is legislative intent. Id. at 542. We presume that the legislature does not intend to permit cumulative punishment that violates double jeopardy. Id. at 557. In Watkins, the Tennessee Supreme Court abandoned the test set forth in State v. Denton, 938 S.W.2d 373 (Tenn. 1996), and adopted the test set out in Blockburger v. United States, 284 U.S. 299 (1932) as the proper test for determining whether multiple convictions under different statutes violate double jeopardy. Watkins, 362 S.W.3d at 556.[4] The Tennessee Supreme Court explained the two-step Blockburger test as follows:

> The first step of the Blockburger test is the threshold question of whether the convictions arise form the same act or transaction. This threshold question should be answered by reference to the charging instrument and the relevant statutory provisions. . . . If the convictions do not arise from the same act or transaction, there cannot be a violation of the double jeopardy protection against multiple punishment. Thus, a threshold determination that multiple convictions do not arise from the same act or transaction ends the inquiry and obviates the need for courts to further analyze double jeopardy claims.
>
> . . . .
>
> If the threshold is surpassed, meaning the convictions arise from the same act or transaction, the second step of the Blockburger test requires courts to

---

[4] In his brief to this court, the Defendant applies the standard of review articulated in Denton, 938 S.W.2d 373. Although at the time of the offenses, April 21, 2011, double jeopardy issues were analyzed under the four-part test set forth in Denton, both this court and the Tennessee Supreme Court have applied the Blockburger/Watkins analysis to double jeopardy claims for offenses committed prior to the Watkins decision. See State v. Cross, 362 S.W. 3d 512 (Tenn. 2012) (applying the Blockburger framework to pre-Watkins offenses); State v. Mahlon Johnson, No. W2011-01786-CCA-R3-CD, 2013 WL 501779 (Tenn. Crim. App. Feb. 7, 2013) (same); see also, State v. Dallas Jay Stewart, No M2011-01994-CCA-R3-CD, 2013 WL 3820992, at *33 (Tenn. Crim. App. July 22, 2013) ("Wakins did not recognize a new constitutional right. Rather it revised the process for analyzing whether a defendant's previously recognized constitutional right had been violated."). Accordingly, we apply the Blockburger framework as adopted in Watkins.

examine the statutory elements of the offenses. If the elements of the offenses are the same, or one offense is a lesser included of the other, then we will presume that multiple convictions violate double jeopardy. However, if each offense includes an element that the other does not, the statutes do not define the "same offense" for double jeopardy purposes, and we will presume that the Legislature intended to permit multiple punishments.

Watkins, 362 S.W.3d at 557.

As directed by Watkins, we begin our analysis with the threshold Blockburger inquiry of whether the Defendant's convictions for criminally negligent homicide and aggravated child abuse arose from the same act or transaction. There was only one victim, and the Defendant was charged with committing both offenses on April 21, 2011, without reference to any specific or discrete acts. Thus, we conclude that the Defendant's double jeopardy claim survives this initial inquiry. Because the General Assembly has not expressed its intent either to permit or to preclude dual convictions of criminally negligent homicide and aggravated child abuse, "we must next examine the statutes defining the crimes of which the [D]efendant was convicted in order to discern legislative intent." Id. at 558. This determination is best made "by examining the statutory elements of the offenses in the abstract, rather than the particular facts of the case." Cross, 362 S.W.3d at 520 (citing Watkins, 362 S.W.3d at 543-44).

Criminally negligent homicide is defined as "criminally negligent conduct that results in death[.]" T.C.A. § 39-13-212(a). Aggravated child abuse is defined as "child abuse . . . as defined in § 39-15-401" and "results in serious bodily injury to the child[.]" T.C.A. § 39-15-402(a)(1). Child abuse as defined in section 401 occurs when a person "knowingly, other than by accidental means, treats a child . . . in such a manner as to inflict injury[.]" T.C.A. § 39-15-401(a). Serious bodily injury is bodily injury that involves a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty, or a broken bone in a child who is eight (8) years of age or less. T.C.A. § 39-11-106(34).

A review of these two statutes reveals marked differences in the offenses. Criminally negligent homicide requires proof of a killing; aggravated child abuse does not. Aggravated child abuse requires proof that the victim was a "child," that is, a person less than eighteen years of age; criminally negligent homicide has no age-based requirement. Each offense includes an element not contained in the other and, therefore, are not the "same offense" for purposes of double jeopardy. See Watkins, 362 S.W.3d at 558 (concluding that aggravated child abuse and reckless homicide are not the "same offense" for purposes of double

-14-

jeopardy).  Additionally, neither offense is a lesser included of the other.  <u>See</u> <u>State v. Godsey</u>, 60 S.W.3d 759, 778 (noting that the Legislature specifically designated child abuse, but not aggravated child abuse, a lesser included offense of homicide).  Accordingly, we conclude that the General Assembly intended to permit multiple convictions in this context.  Therefore, the Defendant's convictions do not violate double jeopardy and he is not entitled to relief.

**CONCLUSION**

Based on the foregoing authorities and analysis, we affirm the judgment of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE