IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 4, 2022

## STATE OF TENNESSEE v. ELIJAH GARRISON

**Appeal from the Circuit Court for Madison County
No. 19-464    Roy B. Morgan, Judge**

_____

### No. W2021-01064-CCA-R3-CD
_____

The Defendant, Elijah Garrison, was convicted by a Madison County Circuit Court jury of first degree murder and unlawful possession of a firearm.  T.C.A. §§ 39-13-202 (2018) (first degree murder); 39-17-1307(b)(1)(A) (2018) (unlawful carrying or possession of a weapon).   The trial court imposed an effective sentence of life plus ten years' confinement.   On appeal, the Defendant contends that the evidence is insufficient to support his first degree murder conviction because it was based on the uncorroborated testimony of accomplices.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which J. ROSS DYER and TOM GREENHOLTZ, JJ., joined.

Elijah Garrison (on appeal), Mountain City, Tennessee, Pro Se; Bede Anyanwu (at trial), Jackson, Tennessee; Lloyd R. Tatum (pretrial), Henderson, Tennessee; John McNeil, Claiborne Ferguson, Ramon Damas, Hayden Lawyer and Chloe Hawes (pretrial), Memphis, Tennessee, for the appellant, Elijah Garrison.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Jody S. Pickens, District Attorney General; Bradley F. Champine, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Defendant's convictions relate to the January 5, 2019 killing of D'Andre Holmes outside an apartment complex in Jackson.  He had been shot multiple times.

Lashun Jones, the victim's father, testified that his son lived at the apartment complex. Jackson Police Officer Bradley Lewis stated that there were cartridge casings near the body and that no weapon was found in the area. Jackson Police Sergeant Adam Pinion located a video recording, which showed events at the time of the shooting, and he said the recording showed that a dark sedan pulled into the apartment complex, shots were heard, the sedan made a U-turn, a shooter wearing dark clothing emerged from the passenger side of the sedan, and more shots were heard. Sergeant Pinion stated that none of the shooter's physical characteristics could be ascertained from the recording, nor did the recording show where in the car the shooter was sitting other than on the passenger side. The recording was received as an exhibit and shown to the jury.

James Bynum, an apartment complex resident, testified that he was in his living room when he heard gunfire. He said he went to a window overlooking the parking lot and saw a tall, "dark-complected" young man, with "some form of dread[s] or something like that coming out of [a] hoodie." Mr. Bynum said the young man exited the passenger side of a burgundy Crown Victoria automobile and walked around the front of the vehicle toward the apartments with his arm stretched out. He related that he heard more gunshots, saw the person run toward the front of the vehicle and enter on the passenger side, and saw the vehicle speed off. Mr. Bynum stated that he went down to help but that he found the victim, whom Mr. Bynum thought was dead, lying on the ground beside a cell phone. Mr. Bynum said he did not see a weapon around the victim. Mr. Bynum said that he returned to his apartment, where he later spoke to the police and gave a written statement.

A.A.,[1] age seventeen at the time of the shooting, testified that he was approximately five feet, five inches tall and had an "afro" at the time. A.A. said he met the Defendant through his mother's boyfriend about three weeks before the shooting. He said that on two occasions the Defendant came to A.A.'s home to "chill" and smoke marijuana. A.A. said the Defendant showed A.A. the Defendant's gun on one such occasion. A.A. stated that he met Tierra Wilson at his home when the Defendant brought her there to relax and to smoke marijuana. A.A. stated he might have met Ms. Wilson for the first time on the day of the shooting.

A.A. testified that, on the afternoon of January 5, 2019, the Defendant and Ms. Wilson picked him up in a Crown Victoria and drove to a Game Exchange. A.A. said that he and Ms. Wilson went inside to sell a game and that afterward they went "riding around." A.A. said that Ms. Wilson drove, he sat in the backseat behind Ms. Wilson, and that the Defendant sat in the front passenger seat. A.A. testified that the Defendant talked on his "flip phone" and directed Ms. Wilson where to drive. A.A. did not know to whom

_____

[1] Because the witness was a minor at the time of the shooting, we will refer to him by his initials.

the Defendant spoke. A.A. said that the Defendant told Ms. Wilson to drive into an apartment complex. A.A. said that he saw the victim using a cell phone and standing on the corner of the street in the apartment complex. A.A. did not know the victim and did not see any weapon.

A.A. testified that, as the car approached the victim, the Defendant lowered the front passenger window, held a gun outside the window, and fired several shots at the victim. A.A. said that the victim "dropped down to the ground." A.A. stated the Defendant got out of the car, stood over the victim, and shot the victim "multiple times." A.A. said that he heard the victim say, "Stop. Somebody coming," and, "Stop. I'm dying." A.A. said the Defendant returned to the front passenger seat, and Ms. Wilson drove the car out of the apartment complex, turning right onto the adjacent road. A.A. stated that he saw the Defendant throw the gun out of the car into a ditch alongside the road. A.A. said he recognized the gun as the chrome and black Smith & Wesson handgun with an extended magazine that the Defendant had previously shown him.

A.A. testified that the shooting "shocked" him and that he "tried to get them to take [him] home, but they was like they wouldn't do that." A.A. stated that Ms. Wilson drove them to Nashville, where they spent the night before proceeding to Knoxville the next day. A.A. said the Defendant directed Ms. Wilson where to go. A.A. testified that while in Knoxville, the Defendant ordered him to "take the car and do something with it" because it was stolen. A.A. stated that he drove the car to a McDonald's in Cookeville, where he texted his mother for help.

A.A. testified that he later met his mother and Jackson Police Sergeant Nick Donald and Lieutenant Chris Chestnut at the McDonald's. A.A. stated that he told them what happened and that he identified the Defendant as the shooter and Ms. Wilson as the driver of the Crown Victoria. A.A. said that when he was in Knoxville, the Defendant said he shot the victim because "[h]e ran off with four zips of ice," meaning four ounces of methamphetamine.

Dr. Emily Dennison, a medical examiner and expert in forensic pathology, testified that she performed an autopsy on the victim's body. Dr. Dennison said the cause of death was "multiple gunshot wounds," including wounds to the hand, head, neck, chest and abdomen. She said there were eleven gunshot wounds.

Tennessee Bureau of Investigation Special Agent James Elkins testified that he arrested Ms. Wilson in Knox County, where he recovered cell phones, none of which were flip phones.

Jackson Police Officer Kyle Hamilton and Investigator Joseph Williams investigated the scene of the shooting at the apartment complex. Officer Hamilton

testified that he took photographs of the scene and located eleven .40-caliber cartridge casings in the area where the victim was found. Officer Hamilton stated that based on information provided by A.A., he and Investigator Williams located a firearm in a muddy ditch approximately 550 feet from the apartment complex on January 8, 2019. The firearm was a .40-caliber Smith & Wesson handgun with an extended magazine. Officer Williams testified that he located the firearm based on the information received from A.A.

Jackson Police Officer John Lewoczko, an expert in firearms examination, testified that all eleven cartridge casings found at the scene of the shooting were fired from the Smith & Wesson handgun recovered near the apartment complex. He said that he also examined three bullets found at the scene and determined that two of the bullets were fired from the recovered gun. The other bullet "lacked sufficient microscopic marks to be determinative" but was otherwise consistent with having been fired from the gun.

Tierra Wilson testified that she had known the Defendant for about a year prior to the shooting. She said that the Defendant had introduced her to A.A. and that on at least two occasions they smoked marijuana at A.A.'s home. She described A.A. as short and small and said the Defendant was taller and stockier with dreadlocks. She was aware that the Defendant was a member of the Crips gang and that he typically carried a gun.

Ms. Wilson testified that on January 3, 2019, she met the Defendant at a Taco Bell restaurant. The Defendant drove a maroon Crown Victoria automobile. She said she and the Defendant spent the next day with A.A. at A.A.'s home. She said that she and the Defendant left A.A.'s home, spent the night with friends, and returned to A.A.'s home the morning of January 5, 2019.

Ms. Wilson testified that she, the Defendant, and A.A. decided to visit a Game Exchange and to sell a video game to get bail money for Ms. Wilson's incarcerated boyfriend. She said that they did not sell any games, that they left and went to the mall where the Defendant purchased marijuana, and that the three of them returned to A.A.'s home to smoke marijuana. Ms. Wilson said that she wanted cigarettes after smoking marijuana, that they left in the Crown Victoria, and that she drove to a store. She stated the Defendant sat in the front passenger seat and A.A. was in the back seat on the driver's side. Ms. Wilson said, as she drove, the Defendant, without explanation, told her to turn into an apartment complex. Ms. Wilson stated that during the trip, the Defendant sent text messages and talked on the phone, was more quiet than normal, and looked around. Ms. Wilson related that the Defendant said, "Oh, s---," pulled out a handgun, and started shooting out of the front passenger window.

Ms. Wilson testified that she drove to the end of the apartment parking lot, turned the car around, and stopped the car because the Defendant pointed the handgun toward

her and told her to stop. She said that the Defendant left the car, walked to the victim, who lay on the ground, stood over him, and "started firing." Ms. Wilson said the Defendant returned to the front passenger seat and told her to drive. She said that she did as he instructed and that neither she nor A.A. left the car while at the apartment complex.

Ms. Wilson testified that soon after she turned right out of the apartment complex, the Defendant threw the handgun out of the window and into a ditch. She said they drove to Nashville, where they spent the night before driving to Knoxville the next day. She related that going to Knoxville was the Defendant's idea. She stated that when they arrived in Knoxville, the Defendant gave the Crown Victoria to A.A. and told A.A. to "drive it." She did not recall any mention that the car was stolen. She said that A.A. seemed reluctant to take the car.

Ms. Wilson testified that she was with the Defendant and his girlfriend, "Nakita," while in Knoxville. Ms. Wilson said she did not feel free to leave. She said that "at some point" she, the Defendant, and his girlfriend returned to Jackson to retrieve the handgun. Ms. Wilson stated that they drove Nakita's car. Ms. Wilson stated that the Defendant had Nakita look for the gun while she and the Defendant stayed in the car but that Nakita could not find it. Ms. Wilson said they returned to Knoxville, where she asked to leave and return home, but the Defendant said, "Hell, no."

Ms. Wilson testified that the Defendant began acting "very jumpy" and "wasn't trusting anyone." She said that she dropped off the Defendant at a hospital and that afterward she was arrested for first degree murder, questioned by the police, and released. She said she never told Nakita about the shooting.

Ms. Wilson testified that she felt "just terrified" and was "panicking" at the time of the shooting. She said she did not realize the Defendant was going to shoot anyone. She stated that she did not know the victim and that the victim did not shoot at them or threaten them in any way. She said she was afraid of the Defendant because he knew where she lived. She stated that she felt as though the Defendant had "basically" kidnapped her. She said that the video recording from the apartment complex was an accurate depiction of what occurred. Ms. Wilson stated that she overheard the Defendant and his girlfriend discussing how the victim stole a game system from the Defendant. Ms. Wilson did not believe the shooting was related to drugs.

On cross-examination, Ms. Wilson stated that she previously had been a member of the Crips but that she was no longer associated with the gang. Ms. Wilson acknowledged that she never tried to get away from the Defendant after the shooting, despite stopping for gas and stopping at other "establishments" as they traveled.

Lieutenant Chris Chestnut, who assisted with the murder investigation, testified that he and Sergeant Donald developed the Defendant as a suspect. Lieutenant Chestnut said they did not think A.A. was the shooter because he did not fit the physical description given by Mr. Bynum and did not have the same build as the shooter in the video recording.

Lieutenant Chestnut testified that no evidence connected A.A. to the shooting before A.A.'s mother contacted the police and before A.A. was interviewed at McDonald's in Cookeville. Lieutenant Chestnut said that A.A.'s mother related that her son had "information that he was present at a homicide and that he feared for his safety." Lieutenant Chestnut said that A.A. identified the Defendant as the shooter, identified Ms. Wilson as the driver, and gave information that allowed law enforcement to locate the handgun. Lieutenant Chestnut said that information provided by A.A. was consistent with the evidence collected at the scene and with the video recording from the apartment complex.

Lieutenant Chestnut testified that information from A.A. led the police to interview Ms. Wilson on January 11, 2019, and that Ms. Wilson's statement was consistent with A.A.'s statement. Lieutenant Chestnut said he never told Ms. Wilson information about the shooter until after she identified the Defendant. Lieutenant Chestnut stated that charges against Ms. Wilson were dismissed as "[t]here was no evidence that indicated [anything] other than her driving the vehicle."

Lieutenant Chestnut testified that A.A. and Ms. Wilson admitted to being in the Crown Victoria, confirmed where people sat, identified the Defendant as the shooter, identified the location where the handgun was recovered, gave the same description of the gun, described similar events of the shooting, said the Defendant was on the phone immediately before the shooting, and said the Defendant directed them to Knoxville after the shooting.

Jackson Police Sergeant Robert Groves testified that he assisted with the murder investigation. Sergeant Groves said he had special training in cell phone forensic extraction using Cellebrite software. Sergeant Groves said that of the three phones found at the time of Ms. Wilson's arrest, he only examined the one believed to belong to the Defendant. Sergeant Groves stated no flip phones were recovered. Sergeant Groves said that he associated the phone with the Defendant because of Ms. Wilson's description and because it contained the Defendant's "digital fingerprints," such as photographs, social media accounts, and email addresses with nicknames associated with the Defendant. Sergeant Groves said that the police department was familiar with the phone and associated it with the Defendant in another investigation.

Sergeant Groves identified several cell phone photographs which showed a handgun that was the same make and model and had the same serial number as the recovered gun. Sergeant Groves said that several photographs on the phone depicted the Defendant holding the gun. Sergeant Groves said that his examination showed that one photograph was taken on November 28, 2018, and that another was taken early in 2019, only days before the shooting.

Sergeant Groves testified that he did not know how many cell phones the Defendant possessed but that the phone that was examined had three phone numbers associated with it, meaning multiple SIM cards had been used with the phone. Sergeant Groves explained that a SIM card associated a particular number with a phone and allowed the phone to communicate with a cellular network. He said SIM cards could be switched between phones. He stated that only a cellular network provider had access to information regarding whether a phone was picked up by a network tower and that he requested information from Verizon for the SIM card that was in the phone and was associated with the Defendant. Sergeant Groves stated that there was no information from the SIM card for several hours after 5:00 p.m. on the day of the shooting. He said that SIM cards will connect with the network regardless of whether a phone was turned on or off. Sergeant Groves said that because there was no information from the SIM card, it likely had been removed from the phone around the time of the shooting and returned to the phone several hours later. Sergeant Groves stated that the first time a cell tower registered the SIM card was in Bucksnort, Tennessee, which was consistent with someone driving from Jackson toward Knoxville on Interstate 40.

The Defendant waived his right to testify. Lieutenant Chestnut testified for the defense that within days after the murder, all evidence implicated the Defendant and that no evidence implicated anyone else.

Upon this evidence, the jury convicted the Defendant of first degree premeditated murder and, after a bifurcated proceeding at which a previous conviction for aggravated burglary was received as evidence, the jury found the Defendant guilty of being a convicted felon in possession of a firearm. This appeal followed.

**Analysis**

The Defendant contends that the evidence is insufficient to support his first degree premeditated murder conviction because the State's proof relied upon the testimony of A.A. and Ms. Wilson, whom the Defendant argues were accomplices. The State contends that the evidence is sufficient to support the conviction, that neither A.A. nor Ms. Wilson was an accomplice, and that even if they were accomplices, the witness testimony was corroborated by other proof.

-7-

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

First degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. §§ 39-13-201 (2014), 39-13-202(a)(1) (2018). In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death. *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); *see* T.C.A. § 39-11-106(a)(18) (2018) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result"). "It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." T.C.A. § 39-13-202(d) (2018). "The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006). As a result, the jury "may infer premeditation from the manner and circumstances of the killing." *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005); *see State v. Vaughn*, 279 S.W.3d 584, 595 (Tenn. Crim. App. 2008). Our supreme court has provided a list of factors which "tend to support the existence" of premeditation and deliberation. *See Bland*, 958 S.W.2d at 660. The list includes the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Id*. (citing *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992); *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1997)).

"When the facts are clear and undisputed concerning a witness' participation in the crime, whether he is an accomplice is a question of law for the court to decide." *State v. Perkinson*, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992); *see Ripley v. State*, 227 S.W.2d 26, 29 (Tenn. 1950) (citations omitted). "An accomplice is defined as a person who

knowingly, voluntarily and with common intent unites with the principal offender in the commission of the crime." *State v. Anderson*, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997) (citing *Perkinson*, 867 S.W.2d at 7).

> The term "accomplice" does not include a person who has guilty knowledge, or is morally delinquent, or who was even an admitted participant in a related but distinct offense. To constitute one an accomplice, he must perform some act or take some part in the commission of the crime or owe some duty to the person in danger that makes incumbent on him to prevent its commission. An accomplice is "one culpably implicated in, or who unlawfully co-operates, aids, abets, or assists in, the commission of the crime charged."
>
> The generally accepted test as to whether a witness is an accomplice is whether he himself could have been convicted for the offense, either as principal or accessory.

*Pennington v. State*, 478 S.W.2d 892, 898 (Tenn. Crim. App. 1971) (quoting 2 *Wharton's Criminal Evidence* § 448 (12th ed. 1955)). A person is not deemed an accomplice simply because he or she was present at the crime scene. *Hicks v. State*, 149 S.W. 1055, 1056 (Tenn. 1912); *Letner v. State*, 512 S.W.2d 643, 647 (Tenn. Crim. App. 1974).

In the light most favorable to the State, the record reflects that both A.A. and Ms. Wilson did not know the Defendant planned to murder the victim before the shooting. Immediately before the shooting, Ms. Wilson was driving to buy cigarettes when the Defendant directed her to turn into the apartment complex. She did not know why. A.A. and Ms. Wilson were present in the car when the Defendant lowered his window and began shooting the victim. Ms. Wilson stopped the car because the Defendant ordered her at gunpoint to stop the car. The Defendant got out of the car and continued shooting the victim as the victim lay on the ground. Ms. Wilson and A.A. remained in the car during the shooting.

No evidence shows that the Defendant announced his intention to shoot the victim before lowering his window and firing his gun. Although A.A. and Ms. Wilson were present for the shooting, mere presence in the car does not render them accomplices in the victim's murder. *See State v. Jackson*, 52 S.W.3d 661, 666 (Tenn. Crim. App. 2001) (a witness's presence in the hallway outside the room where the victim was held did not "implicate[] him in either the kidnapping or murder in such a way as to be an accomplice as a matter of law."); *Letner*, 512 S.W.2d at 647.

The record reflects that Ms. Wilson and A.A. were shocked by the shooting and were afraid of the Defendant. A.A. tried to get Ms. Wilson and the Defendant to take him home, but they would not. As soon as A.A. was able to get away from the

Defendant, he contacted his mother regarding the murder and gave a full statement to law enforcement. Ms. Wilson described her situation as being kidnapped. When she was in Knoxville with the Defendant, she asked to go home, but the Defendant said no. The record does not reflect that A.A. and Ms. Wilson "knowingly, voluntarily, and with [a] common intent with the [Defendant]" united to commit premeditated first degree murder. *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013) (citing *State v. Bough*, 152 S.W.3d 453, 464 (Tenn. 2004); *see Anderson*, 985 S.W.2d at 16. Neither A.A. nor Ms. Wilson was an accomplice.

The record reflects that without provocation, the Defendant shot the unarmed victim eleven times. The last shots occurred while the Defendant was standing over the victim on the ground. The Defendant immediately left the scene without rendering aid to the victim, disposed of the weapon, and forced a person to drive him from Jackson to Knoxville. At the time of the shooting, the Defendant had a prior felony conviction. We conclude that the evidence is sufficient to support the convictions of intentional premeditated murder and unlawful possession of a weapon. The Defendant is not entitled to relief.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE